ANIMAL WELFARE INSTITUTE et al., Appellants,

v.

Juanita KREPS, Secretary of Commerce of the United States, et al.

COMMITTEE FOR HUMANE LEGISLATION, INC. and Friends of Animals, Inc., Appellants,

v.

Juanita KREPS, Secretary of Commerce of the United States, et al.

Nos. 76–2148 and 76–2149.

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1977.

Decided July 27, 1977.

Leonard C. Meeker, Washington, D. C., with whom Richard A. Frank, Washington, D. C., was on the brief, for appellants in No. 76–2148.

Margaret Strand, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., and Bruce C. Rashkow, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee Kreps.

James P. Davenport, Washington, D. C., with whom Lucien Hilmer, Washington, D. C., was on the brief, for appellee The Fouke Co. Ronald G. Precup, Washington, D. C., also entered an appearance for appellee The Fouke Co.

Bernard Fensterwald, Jr., Washington, D. C., entered an appearance for appellants in No. 76–2149.

Before WRIGHT, McGOWAN, and TAMM, Circuit Judges.

Opinion for the court filed by J. SKELLY WRIGHT, Circuit Judge.

J. SKELLY WRIGHT, Circuit Judge:

These appeals arise from a complaint filed in the District Court challenging a decision by the Government appellees to

waive the moratorium imposed by the Marine Mammal Protection Act (MMPA)[1] so as to permit importation into the United States from South Africa of baby fur sealskins. Appellants are eight environmental groups.[2] The District Court dismissed the suit on the ground that appellants lacked standing to sue. We reverse, holding that appellants do have standing and that the Government's decision to waive the ban on importing baby fur sealskins violates the Marine Mammal Protection Act.

## I. HISTORY OF THE CASE

A brief sketch of the statutory scheme is necessary at this point. The MMPA imposes a moratorium on taking or importation of marine mammals or marine mammal products. The Director of the National Marine Fisheries Service (NMFS) can waive the moratorium to allow taking or importation according to the detailed procedural and substantive requirements of the Act. Waiving the moratorium is a two-stage process. In the first stage the agency must determine if there will be a waiver and promulgate regulations containing the terms of the waiver. In the second stage the agency may issue permits authorizing importation to particular applicants.

The annual harvest of baby seals takes place in South Africa in the fall of the year. In 1975 appellee Fouke Company, an importer, sought a waiver and a permit to allow it to import skins from the 1975 harvest. Throughout the administrative proceedings appellants vigorously opposed the waiver. In February 1976 the Director reached a decision that the Cape fur seal herd could sustain a taking of up to 70,000 seals per year. He therefore waived the moratorium on the condition that the total harvest in South Africa not exceed 70,000.[3]

At this point appellants filed their complaint,[4] alleging that the waiver was illegal because (1) seals less than eight months old would be imported, contrary to Section 102(b)(2) of the Act;[5] (2) nursing seals would be imported, contrary to the same section; (3) seals taken in an inhumane manner would be imported, contrary to Section 102(b)(4);[6] and (4) the program of taking marine mammals in South Africa is not consistent with the provisions and policies of the MMPA as required by Section 101(a)(3)(A).[7]

Soon after the complaint was filed and while Fouke's application for a permit was still pending, it became known that the 1975 harvest had exceeded 70,000 seals. Fouke therefore withdrew its application for a permit. Then, in June 1976, the District Court dismissed the suit on the ground that there was no longer a justiciable controversy since the waiver had been cancelled by the failure of its condition. The error in this disposition, as the parties soon pointed out to the court, was that the waiver had continuing validity, subject to annual review,[8] and the condition had failed only in regard to the 1975 harvest. The waiver remained and could become the basis for a permit to import in any future year in which the seal harvest did not exceed 70,000. Therefore, on July 22, 1976 the court vacated its order dismissing the suit and reinstated the complaint.

1. 16 U.S.C. § 1361 et seq. (Supp. V 1975).

2. Animal Welfare Institute, Defenders of Wildlife, Friends of the Earth, Inc., Fund for Animals, Inc., Humane Society of the United States, International Fund for Animal Welfare, Committee for Humane Legislation, Inc., and Friends of Animals, Inc.

3. 50 C.F.R. § 216.32 (1976).

4. Jurisdiction was based in the complaint upon 28 U.S.C. §§ 1331, 1337, and 1361, and 5 U.S.C. §§ 701–706. The Supreme Court has recently held that the Administrative Procedure Act, 5 U.S.C. §§ 701–706, is not an independent grant of subject matter jurisdiction. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Nevertheless, jurisdiction is proper under §§ 1331 and 1337.

5. 16 U.S.C. § 1372(b)(2) (Supp. V 1975).

6. 16 U.S.C. § 1372(b)(4) (Supp. V 1975).

7. 16 U.S.C. § 1371(a)(3)(A) (Supp. V 1975).

8. 50 C.F.R. § 216.32(a)(1) (1976).

[redacted]

The Government then completed its 1976 annual review and decided that conditions continued to justify the waiver. In the fall of 1976 Fouke applied for a permit to import some 13,000 sealskins from the 1976 harvest. Notice of the application was published in the *Federal Register*[9] and appellants promptly submitted their views, urging that the application be denied or at least held in abeyance pending resolution of their suit challenging the waiver. However, notice that the permit had been granted appeared on December 15, 1976.[10] Appellants immediately moved in the District Court for a temporary restraining order and preliminary injunction aimed at preventing importation of the 13,000 sealskins covered by the permit. The District Court denied appellants' motion and dismissed the suit, holding that appellants lacked standing to sue.

Appellants appealed. On December 28, 1976 this court refused to enjoin the importation pending appeal, but agreed to expedite the appeal, and it was stipulated that the briefs on appeal would address the merits of the validity of the waiver as well as the issue of standing.

## II. STANDING

[redacted] The gist of the problem standing is whether the party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends * * *."[11] While that much remains clear and has its roots in the Constitution, application of the principle to a particular complaining party has become difficult in the wake of rapidly developing case law. There is no single test to be derived from the case law to determine if a particular party has standing to sue. Rather, at least three separate inquiries can be distilled from the Supreme Court cases on standing. They are (1) the existence of an injury in fact, (2) whether the requisite causal connection exists between plaintiff's injury and defendant's action, and (3) whether the interest to which injury is claimed is arguably within the zone of interests to be protected by the statute.

### A. *Statutory Basis*

[redacted] Before embarking on these inquiries, however, we must consider whether the MMPA itself confers standing on appellants. For, while Congress cannot of course authorize exercise of judicial power in the absence of a case or controversy, the Supreme Court has held that the injury required by Article III may exist solely by virtue of a statute: "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."[12] A finding that Congress has expressly, "or by clear implication,"[13] conferred standing on appellants would thus obviate the other inquiries.

Unfortunately, the MMPA is not perfectly clear on this point. With regard to *permits* the Act provides for public notice and full participation by all "interested parties" in the proceedings on a permit application.[14] Following the agency decision, "[a]ny applicant for a permit, *or any party opposed* to such permit, may obtain judicial review of the terms and conditions of any permit issued by the Secretary under this section or of his refusal to issue such a permit."[15]

**9.** 41 Fed. Reg. 48149 (1976).

**10.** 41 Fed. Reg. 54790 (1976).

**11.** *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**12.** *Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). *Accord, Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

**13.** *Warth v. Seldin, supra* note 12, 422 U.S. at 501, 95 S.Ct. 2197.

**14.** 16 U.S.C. § 1374(d) (Supp. V 1975).

**15.** 16 U.S.C. § 1374(d)(6) (Supp. V 1975) (emphasis added).

There can be no doubt that appellants— eight environmental groups which participated fully in the administrative proceedings and vigorously opposed grant of the permit to Fouke—qualify as "parties opposed."

With regard to *regulations,* the MMPA requires that they be made on the record after opportunity for an agency hearing and provides for notice to the "public" of the bases for the regulations.[16] But no special provision for judicial review is included. Nevertheless, the legislative history reveals that Congress clearly intended judicial review to be available under the general federal jurisdictional statutes.[17] We conclude that Congress implicitly intended to confer standing to challenge waiver regulations on the same categories of people to whom it gave standing to challenge permits.

We base this conclusion upon the nature of the statutory waiver-permit scheme. It is clear that appellants would have standing under the statute to challenge each and every successive permit issued pursuant to the waiver which they oppose. Yet a requirement that appellants take this route would be unnecessarily wasteful of judicial resources. Further, in addition to being inefficient, seeking review of each permit would be ineffective. There would rarely be enough time for full judicial review of

any particular permit before the importation took place.[18]

For these reasons, appellants originally framed their suit as a challenge to the waiver regulations. But their suit also clearly encompassed a challenge to the *permit* granted to Fouke,[19] and to any future permit, because a permit does nothing more than apply the general authorization contained in the regulations to a particular person.[20] In fact the permit issued to Fouke expressly stated that it was "subject to" the waiver regulations and recited most of those regulations.[21] Thus the "terms and conditions" of the permit—which appellants are expressly given standing to challenge [22] —are the regulations. Just as opposition to the regulations implies opposition to any permit granted thereunder, a challenge to a permit implies a challenge to the regulations.

In view of this interrelationship, to find that Congress gave appellants standing to challenge permits, but not to challenge waiver regulations, would be to exalt form over substance. Accordingly, we hold that appellants' claim of standing here has a firm statutory foundation. Moreover, even if the statute did not provide the answer, appellants also satisfy the three prerequisites for standing in the absence of a statutory grant. We turn now to those tests.

16. 16 U.S.C. § 1373(d) (Supp. V 1975).

17. *See* S.Rep.No.863, 92d Cong., 2d Sess. 7–8 (1972); H. R. Conf. Rep. No. 1488, 92d Cong., 2d Sess. 22–23 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4144, 4187. The general federal jurisdictional statutes relevant here are 28 U.S.C. §§ 1331 and 1337.

18. This fear was borne out in the case of the 1976 permit to Fouke. The permit was issued on December 10, 1976. Notice of issuance was published on December 15. 41 Fed. Reg. 54790 (1976). Fouke ordered the ship carrying the sealskins to sail from South Africa not later than December 29. JA Annex H. Moreover, the permit by its terms expired on April 1, 1977. Annex D to Plaintiffs' Motion for Temporary Restraining Order of December 21, 1976. Consequently, the issue now before us is only the continuing validity of the waiver regulations, and not the validity of any particular permit.

19. And, as a matter of fact, when the Government granted the permit to Fouke, appellants immediately moved for a temporary restraining order and a preliminary injunction against it.

20. This is particularly true in the context of sealskin importing, in that Fouke, as the only importer of sealskins into the United States, is the *only* potential beneficiary of the waiver. Fouke's brief at 4; S. Rep. No. 863, *supra* note 17, at 3.

21. Annex D to Plaintiffs' Motion for Temporary Restraining Order of December 21, 1976.

22. 16 U.S.C. § 1374(d)(6) (Supp. V 1975).

## B. *Traditional Analysis*

### 1. *Injury in Fact*

The first and most basic requirement is that appellants allege some injury in fact.[23] Appellants are eight organizations devoted to preservation of wildlife and humane treatment of animals. In their complaint they allege:

10. The Plaintiff organizations bring this action on behalf of themselves and their members, each of whom has a personal stake in the maintenance of a safe, healthful and productive environment and in the protection of marine mammals. The decision of the Defendants described herein will contribute to the death and injury of marine mammals and injury to the ecosystem of the South Atlantic Ocean. The Defendants' decision will cause the members of the Plaintiff organizations injury and will adversely affect them in one or more of their activities or recreational pursuits. The decision impairs the interests of the Plaintiff organizations and their members in observing and studying marine mammals including the Cape fur seal. Through sanctioning the seal harvesting method of the South African Government, the Defendants' decision impairs the ability of members of the Plaintiff organizations to see, photograph, and enjoy Cape fur seals alive in their natural habitat under conditions in which the animals are not subject to excessive harvesting, inhumane treatment and slaughter of pups that are very young and still nursing. The Defendants' decision impairs the efforts of the Plaintiff organizations and their members to assure the carrying out of sound conservation practices with respect to the Cape fur seal, in accordance with the MMPA. The decision impairs their efforts to assure humane treatment of marine mammals in conformity with the Act. The

MMPA was enacted in response to public outcry against the commercial exploitation of very young and still nursing marine mammals, particularly seals. The Defendants' decision impairs the interests of the Plaintiff organizations and their members in seeing to it that the provisions of the MMPA are given full effect in accordance with the mandate of Congress.

JA Annex B at 7–8. In examining this claim we cannot ignore the fact that the MMPA is an unusual statute: its sole purpose is to promote protection of animals. Where an act is expressly motivated by considerations of humaneness toward animals, who are uniquely incapable of defending their own interests in court, it strikes us as eminently logical to allow groups specifically concerned with animal welfare to invoke the aid of the courts in enforcing the statute. But we need not rely on this observation, because appellants allege injury in fact which satisfies the traditional test.

■ It is well settled that an organization may have standing to sue as the representative of its members, based on injury to its members or any one of them.[24] Appellants have satisfied this requirement by alleging injury to the recreational, aesthetic, scientific, and educational interests of their members.

It is also well settled that harm to interests of this type may amount to an injury in fact sufficient to lay the basis for standing.[25] In *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972), the Supreme Court stated:

Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make

**23.** *Ass'n of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**24.** *Warth v. Seldin, supra* note 12, 422 U.S. at 511, 95 S.Ct. 2197; *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361 (1972); *NAACP v.*

*Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

**25.** *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton, supra* note 24, 405 U.S. at 734, 92 S.Ct. 1361.

them less deserving of legal protection through the judicial process. * * *

The District Court agreed that appellants' interests were cognizable, but it held that appellants lacked standing because there was no showing that they were "on any different footing from any other concerned citizen." [26] But the Supreme Court has clearly stated that this is not a ground for denying standing. In *United States v. SCRAP* the Court said:

> Nor, we said [in *Sierra Club*], could the fact that many persons shared the same injury be sufficient reason to disqualify from seeking review of an agency's action any person who had in fact suffered injury. * * *
>
> * * * * * *
>
> * * * [A]ll persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here. But we have already made it clear that standing is not to be denied simply because many people suffer the same injury. * * * To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.[27]

The District Court also found that appellants' injury was insufficient to confer standing because, even if they sought to observe the seals in South Africa, they could be prevented from doing so by the government of South Africa. Appellants submitted affidavits of several of their members stating that they had gone in the past, or planned to go in the future, to South Africa to observe the fur seals. This is the kind of allegation which the Supreme Court approved as sufficient in *Sierra*

*Club*.[28] Plaintiffs there were not required to prove that no contingency might prevent them from using the national forest in the future. Similarly, there is no basis for burdening appellants, as the trial judge would, with the additional requirement of demonstrating "that the permission of the South African Government has been secured." [29] Surely it cannot be presumed that South Africa will prevent all of appellants' members from observing any seals in the future.

■ Appellees make much of the fact that appellants' affidavits describe only two members who have travelled to South Africa to view the seals in the past, and one who plans to do so in the future. But it is well settled that standing does not depend on the size or quantum of harm to the party. The Supreme Court has stated, "The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action * * *." [30] Further, in *United States v. SCRAP* the Court directly addressed this argument:

> The Government urges us to limit standing to those who have been "significantly" affected by agency action. But, even if we could begin to define what such a test would mean, we think it fundamentally misconceived. "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, * * * a $5 fine and costs, * * * and a $1.50 poll tax * * *. * * * * [31]

---

26. JA Annex E at 3.

27. 412 U.S. at 686–688, 93 S.Ct. at 2415. Accord, *Schlesinger v. Reservists to the Stop War*, 418 U.S. 208, 229, 94 S.Ct. 2692, 41 L.Ed.2d 706 (1974) (Stewart, J., concurring).

28. *Sierra Club v. Morton, supra* note 24.

29. JA Annex E at 3 n.1.

30. *Warth v. Seldin, supra* note 12, 422 U.S. at 511, 95 S.Ct. at 2211–12 (emphasis added).

31. 412 U.S. at 689 n.14, 93 S.Ct. at 2417 (citations omitted).

## 2. *Causation*

■ A second [32] prerequisite to standing which has recently emerged is a showing of a sufficient causal relationship between the challenged act and the alleged injury. A party must show that his injury reasonably can be said to have resulted from defendant's alleged statutory infraction.[33] Put another way, he must show that "there is a substantial probability" that, if the court affords the relief requested, his injury will be removed.[34] Standing will be denied if the causal relationship is, in the court's view, "purely speculative." [35]

Appellees contend that appellants fail this test because there is no causal relationship between the Government's alleged failure to enforce the MMPA and South Africa's seal harvesting practices. Strict enforcement of the moratorium on importing sealskins, they contend, would have no effect on the well-being of seals in South Africa; South Africa would go right on killing seals less than eight months old or nursing, and killing seals in an inhumane manner, even if the resultant sealskins could not be imported into the United States.

As a factual matter, this argument must fail. We know that prior to deciding the terms of the waiver there were extensive negotiations between officials of the Department of Commerce and the South African government.[36] There is a letter in the record from the Director of Sea Fisheries for the South African government, responding to a Commerce Department inquiry about Fouke's application for a waiver. In explaining his government's sealing practices he states:

> No new or amended laws and regulations pertaining to sealing have become effective since August 1, 1975. The draft regulations covering harvesting methods which were drawn up during 1975 were initially held in abeyance pending a study of additional information and guidance on this subject arising out of the September 1975 hearing in Washington and your waiver regulations. * * * [37]

Further, one of appellees' own arguments on the merits defeats their argument on causation. To succeed on the merits of justifying the waiver of the moratorium, appellees must show, among other things, that South Africa's program for taking fur seals is consistent with the provisions and policies of the MMPA.[38] In its effort to demonstrate this, appellee Fouke states in its brief:

> (2) *Age/Nursing.* South Africa's Sea Birds and Seals Protection Act provides that the Sea Fisheries Branch may restrict seal harvesting on the basis of the seals' age, size and sex. In 1975, acting under this authority, the Sea Fisheries Branch delayed the start of harvesting at most rookeries *in order to accommodate the MMPA standards on age and nursing* * * *. * * *

> These measures evince a commitment by South Africa to adhere to the standards of the MMPA. * * * [39]

---

**32.** This test may be viewed as part of the injury in fact requirement, but we separate it here for the sake of clarity. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Note, *The Causal Nexus: What Must Be Shown for Standing to Sue in Federal Courts*, 29 U. Fla. L. Rev. 250 (1977).

**33.** *Simon v. Eastern Kentucky Welfare Rights Organization, supra* note 32; *Warth v. Seldin, supra* note 12; *Linda R. S. v. Richard D., supra* note 12.

**34.** *Warth v. Seldin, supra* note 12, 422 U.S. at 504, 95 S.Ct. 2197.

**35.** *Simon v. Eastern Kentucky Welfare Rights Organization, supra* note 32, 426 U.S. at 42, 96 S.Ct. 1917.

**36.** *Diggs v. Richardson*, 555 F.2d 848 (D.C. Cir. 1976) (held: allegation that Government dealings with South Africa concerning importation of sealskins from Namibia violate United Nations Security Council resolution that South African occupation of Namibia is illegal was not justiciable).

**37.** JA Annex K.

**38.** 16 U.S.C. § 1371(a)(3)(A) (Supp. V 1975).

**39.** Fouke brief at 40–41 (emphasis added).

In the face of these statements and the evidence in the record, appellees' contention that South Africa is oblivious to whether its seal harvest can be imported into the United States must fail.

In addition, we believe that Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship between American importing practices and South African sealing practices. The MMPA addresses not only the killing of marine mammals by Americans but also the importation of them. This reflects a congressional decision that denial of import privileges *is* an effective method of protecting marine mammals in other parts of the world. This conclusion is supported by the legislative history.[40]

In the face of this congressional determination, it is impossible to conclude, as appellees urge us to, that the causal relationship is "purely speculative."[41] As we have seen, there is also substantial factual evidence in the record of this case that South African sealing practices *will* respond to stricter enforcement of the MMPA. Therefore we hold that appellants do satisfy the causation test for standing.[42]

**40.** S. Rep. No. 863, *supra* note 17, at 11. The report states:

The committee considers that the adoption of this bill will place the United States in a position of world leadership in protection and conservation of marine mammals. The committee wishes to emphasize the need for international cooperation. * * * Moreover, with sealing in the Antarctic a pending reality, even further communication and cooperation are needed between nations to prevent an increased slaughter of these animals for commercial purposes without a complete understanding of the population dynamics of those animals in that part of the world. It is believed that this legislation can provide a start to assure that future generations will be able to enjoy a world populated by all species of marine mammals.

**41.** Cf. *Simon v. Eastern Kentucky Welfare Rights Organization, supra* note 32.

**42.** In *Eastern Kentucky* the Court demanded an extremely high degree of proof of causation and found it wanting. Two factors distinguishing that case from this one suggest that the Court would not impose as rigid a burden on our appellants. First, in *Eastern Kentucky* the plaintiffs attempted to challenge IRS action af-

### 3. *Zone of Interests*

The third test for standing is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."[43] Neither appellees nor the District Court dispute the fact that appellants satisfy this test. Indeed, the MMPA was enacted at the urging of appellant organizations,[44] and the declaration of policy contained in the Act makes clear that appellants' interests are precisely those which Congress sought to protect:

[M]arine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of the Congress that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. * * *[45]

fecting the tax status of third parties under a statute which was completely silent as to any right to judicial review. The MMPA, by contrast, contains an explicit grant of judicial review. Second, tax cases have traditionally been treated as a special class to which both Congress and the courts have applied the most rigorous threshold requirements for judicial review. While the Court did not explicitly rely on this factor, it is an aspect of the case which we cannot ignore. *See* 426 U.S. at 36–37, 96 S.Ct. 1917.

**43.** *Ass'n of Data Processing Service Organizations, Inc. v. Camp, supra* note 23, 397 U.S. at 153–154, 90 S.Ct. at 830.

**44.** For example, appellants Defenders of Wildlife, Friends of the Earth, Inc., Fund for Animals, Inc., Humane Society of the United States, and International Fund for Animal Welfare were active in urging enactment of the MMPA and their representatives testified on the legislation before its passage and at oversight hearings on the MMPA since 1972. Complaint ¶¶ 4–8, JA Annex B at 3–6.

**45.** 16 U.S.C. § 1361(6) (Supp. V 1975).

## III. THE MERITS

### A. Age Limitation

Appellants charge that the Government appellees' decision to waive the moratorium is illegal in four respects. The first is that it would permit importation of sealskins from animals that were less than eight months old at the time of taking, in contravention of Section 102(b)(2) of the MMPA.[46]

In the waiver decision and the regulations implementing it the Government defined eight months old to mean "eight months old as determined by using a mean birthdate for the Cape fur seal of December 1 for any one pupping season."[47] Thus the Government deems any seal killed on or after August 1 each year old enough to be imported. The Government defends this regulation on the ground that some such method for determining the age of animals in the wild is a practical necessity. We agree, but the method chosen by the Government blatantly violates the Act.

It is undisputed that the annual pupping season for Cape fur seals is from November to December. Five percent of the new seals are born by November 14, 50 percent by December 1, and 95 percent by December 18. The Government considered these data and deliberately chose a formula which permits fully _half_ the seals imported to be _less than_ eight months old when killed. This interpretation flatly contradicts the plain language of the statute: "it is unlawful to import into the United States _any_ marine mammal if _such_ mammal was * * marine mammal if _such_ mammal was * *

less than eight months old * * *."[48] The legislative history confirms that Congress meant to refer to individual animals, not groups or populations with a mean age of eight months.[49] This is also the view of the Marine Mammal Commission, an expert body created by the MMPA to advise the Secretary of Commerce.[50]

We agree with the Government "that it is impossible to avoid entirely the chance that a _single_ sealskin might be imported from an underage seal."[51] But, faced with this problem, the Government has decided to allow _half_ the sealskins imported to be from underage seals. This formula is so far from meeting the statutory standard that it must be rejected.[52]

### B. Nursing

The statute also prohibits importation of sealskins from animals who were "nursing at the time of taking * * *."[53] The Government determined that this provision, like the age limitation, would be impossible to administer unless the agency established some general standard for all seals. In the waiver and regulations the Government set such a standard: first, it ruled that "nursing" means "nursing which is obligatory for the physical health and survival of the nursing animal";[54] second, it ruled that each and every seal has ceased obligatory nursing by August 1.[55] Appellants contend that there is nothing in the statute or the legislative history to justify the distinction between "obligatory" and "convenience" nurs-

---

**46.** 16 U.S.C. § 1372(b)(2) (Supp. V 1975). The statute prohibits importation of marine mammals and marine mammal products if the animal was "nursing at the time of taking, or less than eight months old, whichever occurs later."

**47.** 50 C.F.R. § 216.32(d)(2) (1976).

**48.** 16 U.S.C. § 1372(b) (Supp. V 1975) (emphasis added). Section 1372(c)(2) extends the prohibition to any product from a marine mammal whose importation would be unlawful.

**49.** 118 Cong. Rec. 7689 (March 9, 1972).

**50.** Administrative brief of Marine Mammal Commission at 12, _quoted in_ appellants' brief at 23.

**51.** Government brief at 15 (emphasis added).

**52.** While we do not decide what date the Government could lawfully establish, it appears on the basis of the data before us that December 18, when about 95% of the seals have been born, would be a logical choice; thus all seals could be deemed to be at least eight months old if they are killed on or after August 18 each year.

**53.** 16 U.S.C. § 1372(b)(2) (Supp. V 1975).

**54.** 50 C.F.R. § 216.32(d)(4) (1976).

**55.** 50 C.F.R. § 216.32(e)(1)(ii)(C) (1976); 41 Fed. Reg. 7511 (1976).

ing and that, in any event, all seals have not ceased obligatory nursing by August 1.

In order to decide whether the Government's distinction is consistent with the statute, it is necessary to know what the purpose of the "nursing" prohibition was. Why was Congress concerned about the killing of nursing animals? The legislative history sheds little light on this question. But the parties agree the restriction does not relate to reproduction or maintenance of the seal population, because seals do not reproduce until at least a year after they have ceased all nursing. Rather, it appears that Congress was responding to an emotional conviction that killing babies who were still nursing was intolerably cruel. The legislative history speaks of "public indignation" and "public opinion." [56] Nursing seems to have been used as a measure of infancy, of vulnerability and helplessness. While it is admittedly unusual to find a statutory purpose based entirely on emotional concerns, it is perfectly proper in the context of a statute which also prohibits killing in an "inhumane" manner, where humane is defined as involving "the least possible degree of pain and suffering practicable to the mammal involved." [57] There is surely no "resource management" explanation for this provision; nor is there, as far as we know, for the nursing prohibition.

Assuming then that the statute responded to emotional concerns, there is clearly no justification for the technical distinction between obligatory and convenience nursing

which the Government grafted onto the statute. The statute is plain; it bars importation of any animal which was "nursing at the time of taking." It is undisputed that seals cease all nursing by October each year, when the mother seals leave the rookeries. Therefore, as in the case of age, there was available to the Government a workable, standard method of applying the provision. Instead, the Government invented a distinction whose only purpose was to allow more importation of seals.[58] As the Marine Mammal Commission stated in opposing the Government's decision:

> As in the case of mean date of birth, the concept of obligate nursing is necessary in order to resolve a special problem faced by the applicant and is not necessary in order to remedy any fatal defect in the Act. * * *
>
> * * * Contrived arguments that the applicant can import an animal which was killed because it did not *need* to nurse in order to survive but was only doing so as a *convenience* [are] irrelevant and inadequate for purposes of satisfying the categorical, unqualified statutory mandate of Section 102(b)(2) * * *.[59]

Because we reject the Government's use of the obligatory nursing concept to narrow the unambiguous command of the statute, we do not reach the question of when obligatory nursing ceases.[60]

### C. *Humane Manner*

Appellants' third contention is that the Government's decision to waive the morato-

---

**56.** S. Rep. No. 863, *supra* note 17, at 2, 5.

**57.** 16 U.S.C. §§ 1372(b)(4), 1362(4) (Supp. V 1975).

**58.** The regulation followed a report by a National Marine Fisheries Service representative, who had visited South Africa, that nursing

is the critical question regarding a waiver of the moratorium under the Marine Mammal Protection Act. During this trip, the stomachs of 20 seals were examined. The majority contained no food while one contained milk, indicating some seals were still nursing. The final resolution of the question would seem to depend upon either one of two actions:

   1. An amendment of the Act, or

   2. A legal determination that the Act refers to obligatory nursing only and a biological determination that obligatory nursing is completed by a predetermined date. Annex D to Plaintiffs' Motion for Preliminary Injunction of March 24, 1976.

**59.** Administrative brief of Marine Mammal Commission at 14–15, *quoted in* appellants' brief at 28 (emphasis in appellants' brief).

**60.** We also do not decide what date the Government could lawfully establish for the termination of all nursing. As we noted *supra* in our discussion of age, it may be necessary as a practical matter to fix a date which allows importation of a *few* nursing seals. What we do hold is that any date fixed solely by reference to obligatory nursing is invalid.

rium is illegal in that it allows importation of seals taken in an inhumane manner, in violation of Section 102(b)(4) of the Act.[61] Humane is defined to mean "that method of taking which involves the least possible degree of pain and suffering practicable to the mammal involved." [62]

The parties agree that the most humane method of killing is the so-called "stun and stick" method. The method involves three stages: (1) the roundup drive; (2) clubbing the animal so as to render it unconscious; and (3) severing the great arteries or heart with a knife to kill the animal quickly. The parties also agree that this is the method used in South Africa, but appellants claim that it is not properly put into practice there. Appellants contend that humaneness requires that each seal be rendered instantly and permanently unconscious by a single blow. They cite testimony that in South Africa as many as 40 percent of the seals required a second blow. They also allege that practices at harvests where no observers are present can be presumed to be worse than those observed by the witnesses.

Unlike appellants' claims regarding age and nursing, which involved questions of statutory interpretation, their humaneness contention involves only a finding of fact. The Director of the National Marine Fisheries Service made a determination on the administrative record that the South African harvest was conducted in a humane manner. Our role in reviewing this finding is limited; we can reject it only if it is not supported by substantial evidence.[63] While we might agree that South Africa's record of stunning seals with a single blow could certainly be improved,[64] we cannot say that the Director's finding is not supported by substantial evidence on the record as a whole. There was expert testimony that multiple blows were not necessarily inhumane, provided they were delivered within a minimal period of time. Two out of three observers concluded that the harvest they observed was, overall, humane. And the record before us provides no solid support for appellants' speculation that other harvests were undoubtedly worse. Therefore, we affirm the Director's finding on this point.

### D. Consistency with the MMPA

The MMPA provides that

no marine mammal or marine mammal product may be imported into the United States unless the Secretary certifies that the program for taking marine mammals in the country of origin is consistent with the provisions and policies of this chapter. * * * [65]

The Secretary did so certify in the decision to waive the moratorium,[66] but appellants contend that the certification is invalid because the record does not support a finding that South Africa's sealing practices are consistent with the provisions and policies of the MMPA.

Our decision on this claim is dictated by our holdings on appellants' other claims. Even if we assume that South Africa killed no seals prior to August 1,[67] as dictated by the Government appellees' construction of the age and nursing provisions of the Act, the record shows that up to 50 percent of them were less than eight months old and many of them were still nursing. The Government used its mean birthdate and obligatory nursing constructs to legitimate these killings, but we have held that the Government interpretations do not comply with the Act. It is therefore clear that South Africa's sealing program is not con-

---

**61.** 16 U.S.C. § 1372(b)(4) (Supp. V 1975).

**62.** 16 U.S.C. § 1362(4) (Supp. V 1975).

**63.** 5 U.S.C. § 706(2)(E) (1970); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

**64.** Appellants point out that at the American seal harvest in the Pribilof Islands a second

blow is required to render the seal unconscious in less than 5% of the clubbings.

**65.** 16 U.S.C. § 1371(a)(3)(A) (Supp. V 1975).

**66.** 41 Fed. Reg. 7539 (1976).

**67.** Appellants assert that the harvest began as early as June at some sites.

sistent with the provisions of the MMPA, in that South Africa kills many animals which are nursing or less than eight months old at the time of taking.

Appellants offer as an additional ground for invalidating the certification the fact that the MMPA is based on a policy of "optimum sustainable population" (OSP) while South Africa's sealing program is based on a policy of "maximum sustainable yield" (MSY). Both OSP and MSY are efforts to quantify how many animals can be taken each year without depleting the population. However, both are exceedingly difficult to apply with any precision. The MMPA sets as a goal "to obtain an optimum sustainable population keeping in mind the optimum carrying capacity of the habitat."[68] But in our view the definitions of both OSP and optimum carrying capacity are singularly unenlightening; each is defined in terms of the other.[69] The Government, conceding that it has had trouble with the terms, has decided that OSP is not a fixed population level at all but a population range.[70]

We are reluctant to jump into this fray. The Director found that the South African seal population is healthy and growing and that what South Africa is trying to achieve via MSY—a healthy seal herd in a balanced ecosystem—is consistent with what the MMPA seeks to achieve via OSP. Appellants disagree, saying that MSY inherently means harvesting more animals than OSP. But appellants admit that they too do not really know what either term means,[71] and they do not deny that the seal herds are growing under South African management. On the basis of this cloudy record, we cannot conclude that MSY is definitely inconsistent with OSP. We do not foreclose the question for the future, however, when experience and sharper definitions might require a different conclusion.

## IV. CONCLUSION

We reverse the District Court's decision that appellants lacked standing to bring this suit. On the merits, we hold that the Government's decision to waive the moratorium on importation of baby fur sealskins contravenes the MMPA in that it permits importation of skins taken from animals who were less than eight months old or who were nursing at the time of taking. For the same reason the Secretary's certification that South Africa's sealing program is consistent with the provisions and policies of the MMPA is invalid. Accordingly, the waiver decision and the regulations implementing it are hereby set aside.

*Reversed.*

---

**68.** 16 U.S.C. § 1361 (Supp. V 1975).

**69.** 16 U.S.C. § 1362 reads in part:
(8) The term "optimum carrying capacity" means the ability of a given habitat to support the optimum sustainable population of a species or population stock in a healthy state without diminishing the ability of the habitat to continue that function.
(9) The term "optimum sustainable population" means, with respect to any popula-

tion stock, the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the optimum carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element.

