CHAMBER OF COMMERCE OF the
UNITED STATES of
America, Plaintiff,

v.

DEPARTMENT OF INTERIOR et
al., Defendants.

Civ. A. No. 77–1573.

United States District Court,
District of Columbia,
Civil Division.

Nov. 3, 1977.

Raymond A. Peck, Jr., Washington, D. C., for plaintiff.

Irwin L. Schroeder, Dept. of Justice, Washington, D. C., for defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This is the latest of several actions filed in this Court to challenge agency submissions of legislative proposals to Congress on the ground that the proposals were not accompanied by adequate environmental impact statements, as required by section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C). *See Atchison, Topeka & Santa Fe Railway Co. v. Callaway*, 431 F.Supp. 722 (D.D.C.1977); *Wingfield v. OMB*, 10 ERC 1961 (D.D.C.1977), *appeal docketed* (D.C. Cir. Apr. 4, 1977).

Section 102(2)(C) of NEPA requires that a detailed environmental impact statement be included in "every recommendation or report on proposals for legislation" submitted by a federal agency to the Congress.

Plaintiff's motion is for declaratory and injunctive relief. For the reasons given herein, the motion for declaratory relief, and for injunctive relief of both temporary and permanent character, is denied.

## I. BACKGROUND.

The plaintiff, Chamber of Commerce of the United States of America (Chamber) a non-profit District of Columbia corporation, is the largest association of business enterprises in the United States. Its direct membership encompasses in excess of 65,-000 businesses of different sizes, and more than 3,700 state and local Chambers of Commerce and similar groups. The Chamber has advanced its position on environmental issues both before the Congress and in the courts.

The origins of its action here are in the portions of the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §§ 1601 *et seq.* (Supp. V 1975), which promulgate procedures for establishing the status of federal lands in Alaska not committed to Native corporations or reserved for special purposes. Comprising approximately 365 million acres, Alaska is the largest state of the Union. Of the approximately 215 million acres remaining in federal ownership, about 75 million are already part of the so-called four national-interest systems: National Park, National Forest, National Wildlife Refuge, and the National Wild and Scenic Rivers Systems. Section 17(d)(1) of the Alaska Native Claims Settlement Act (ANCSA) provided that, during the 90 days following passage of the Act, all unreserved federal lands in Alaska automatically would be withdrawn from "all forms of appropriation under the public land laws," including mining and mineral leasing laws. 43 U.S.C. § 1616(d)(1). Section 17(d)(2)(A) directed

the Secretary of the Interior to withdraw up to 80 million acres of unreserved federal land for study to determine whether the lands should be included in the national-interest systems. *Id.* § 1616(d)(2)(A). Over the two-year period following passage of the ANCSA, the Secretary was to forward recommendations to the Congress on which of the withdrawn lands should be included in the national-interest systems. *Id.* § 1616(d)(2)(C), (D).

On December 17, 1973, then Secretary Morton submitted proposals pursuant to section 17(d)(2) recommending that 83.47 million acres be added to the national-interest systems. Known as the "Morton proposals," these recommendations were based on draft environmental impact statements (EIS), which were the subject of extensive public comment between then and 1975, when the Final EIS's containing 16,800 pages were issued in their 28-volume final form. In March 1975, the Secretary forwarded new recommendations, based on the Final EIS's, and altering both the acreages to be included in the national-interest systems and the procedures for management of these lands. Congress took no final action on either set of recommendations.

In January 1977, Congressman Udall of Arizona, upon his own initiative, introduced a bill identified as the vehicle by which the House of Representatives would consider additions to the Alaska national-interest systems. H.R. 39, 95th Cong., 1st Sess.[1] As drafted, the bill would add about 116 million acres, as either new units or extensions of existing units, to the four Alaska national-interest systems. In April 1977, defendant Andrus, the incumbent Secretary of the Interior, testified before a subcommittee of the House Committee on Interior and Insular Affairs to the effect that H.R. 39 was under study within the Department of the Interior, and that the Department's response to the bill would be forthcoming in August or September 1977. By letter of August 2, 1977, Committee Chairman Seib-

---

1. Other pending bills bearing on the Alaska lands programs are H.R. 1652 and H.R. 2082, both before the House Committee on Merchant Marine and Fisheries, and S. 1787, introduced by Senator Stevens of Alaska.

erling requested Secretary Andrus to submit the Department's views to the Committee by September 9, 1977, and to testify before the Committee on September 15, 1977.

On September 14, 1977, plaintiff appeared before this Court to request a temporary restraining order to prevent the Secretary from submitting the Department's views to the Committee and giving testimony thereon. The motion was denied.

The Secretary testified as scheduled, and presented the Department's recommendations as to H.R. 39. In summary, they would place about 92 million acres of Alaska lands into the four systems: about 41.7 million acres in new and existing National Parks and Monuments areas, 45.1 million acres in National Wildlife Refuges, 33 rivers totalling 2.45 million acres in the National Wild and Scenic Rivers System, and 2.5 million additional acres to existing National Forests. In developing the so-called Andrus proposals, the Department reviewed both the Morton proposals and the bills before the House of Congress, prepared an option paper, and forwarded ensuing recommendations to the Office of Management and Budget. A few questions which could not be resolved by interagency consultation within the OMB were presented to the President for decision. During the summer of 1977 the Congressional committees responsible for the pending bills held hearings in Alaska and the contiguous 48 states to solicit public response in the form of testimony and comments on the bills. However, the Department prepared nothing in the form either of an additional EIS on the Andrus proposals or of a "negative determination" that an EIS would not be required in this context.

Plaintiff's challenges to the process by which the Andrus proposals were developed and submitted to Congress are numerous. Among the legislative and administrative strictures the plaintiff asserts the Department's actions to have violated are NEPA itself, 42 U.S.C. § 4332(2)(C); a Presidential directive regarding federal agency implementation of the NEPA requirements, Exec. Order No. 11,514, 35 Fed.Reg. 4,247 (1970), reprinted in 42 U.S.C. § 4321 app., at 10,658; the Council on Environmental Quality regulations on the subject, CEQ Guidelines on Preparation of Environmental Impact Statements, 40 C.F.R. § 1500.5(a)(1) (1976); the Department's own manual, "Statement of Environmental Impact," par. 516, ch. 2.5.A(1), reprinted in 36 Fed.Reg. 19,343, 19,344 (1971), and other statutes such as the Federal Land Policy and Management Act of 1976, 43 U.S.C.A. § 1782(a) (Supp.1977). The defendants' position has been that the Andrus proposals are an elaboration on the earlier Morton proposals and therefore not "proposals for legislation" under section 102(2)(C) of NEPA; that the EIS prepared in connection with the Morton proposals treats adequately the provisions of the Andrus proposals with a few minor exceptions and therefore there has been substantial compliance with NEPA; that the Andrus proposals were in response to a Congressional initiative, and thus not subject to NEPA; that the plaintiff lacks standing to bring the action, and that the relief sought cannot be granted.

The disposition of this action on grounds of lack of standing to sue obviates consideration of plaintiff's substantive assertions that the Department's actions violate NEPA. However, a few observations on the merits are in order. First, many of the factors that render this action not justiciable because of lack of standing also would militate against a decision on the merits for the plaintiff. For example, the very speculativeness of the injury plaintiff alleges also would limit plaintiff's ability to satisfy the requirement of irreparable injury for injunctive relief. That the asserted injury is not redressable by injunctive relief weighs against the plaintiff in terms of both justiciability and the availability of injunctive relief. Second, the evidence in the record raises substantial doubts as to the plaintiff's likelihood of success on the merits. The Government has argued at least colorably that the Andrus proposals are not, in fact, "proposals for legislation," but responses to Congressional requests for comments and therefore beyond the ambit of

NEPA. Moreover, to the extent that the Andrus proposals evolved from the Morton proposals, and do not have "any broader implications or impacts" than the earlier proposals, which proposals accompanied by Final EIS's are already before Congress, raise serious questions to plaintiff's likelihood of ultimate success.

## II. STANDING TO SUE.

The implications of this action extend beyond questions of standing, into other "facets of the broader concept of justiciability" such as the political question doctrine and the ripeness doctrine. *See Harrington v. Bush,* 180 U.S.App.D.C. 45, 49, 553 F.2d 190, 194 n.6 (1977). The absence of standing here, however, renders consideration of the latter doctrines unnecessary.

In the words of Justice Powell's deceptively simple formulation, "when a plaintiff's standing is brought into issue, the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1975). In *Harrington v. Bush,* the District of Columbia Circuit has set forth four separate inquiries distilled from Supreme Court articulations of the standing doctrine. 553 F.2d at 205 n.68.[2] The first is the existence of the "irreducible constitutional minimum" of "injury in fact," the absence of which obviates consideration of the others. Second, the interests asserted by the plaintiff must fall "arguably within the zone of interests" protected by the statute. *See Association of Data Processing Servs. Organization, Inc.*

*v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Third, the injury asserted must be causally related to the allegedly illegal action, *Simon, supra,* 426 U.S. at 41–42, 96 S.Ct. 1917; *S. v. D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Fourth, the injury must be "likely to be redressed by a favorable decision," *Simon, supra,* 426 U.S. at 38, 96 S.Ct. 1917, in that the action's "outcome will *demonstrably cause him to win or lose in some measure.*" *Harrington,* 180 U.S.App.D.C. at 61, *supra* 553 F.2d at 206.

1. *Injury in Fact.* Plaintiff's allegations disclose two discrete sources of interest for purposes of standing to sue. The first arises out of the Chamber's own "long-standing commitment to the conservation of our Nation's natural resources and the responsible development of these resources . . ." Affidavit of William G. Van Meter, ¶ 2. The second stems from the interests, economic and otherwise, of individual Chamber members in the status of the lands encompassed within the Andrus proposals. Each kind of interest is cognizable for purposes of determining standing under NEPA: an organization may have standing to sue in representation of its members, based on injury to one or more of them, *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and the interests infringed may be environmental and aesthetic as well as economic. *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254; *Sierra Club v. Morton, supra,* 405 U.S. at 734, 92 S.Ct. 1361.

---

**2.** Considerable confusion within the District of Columbia Circuit has arisen with respect to the status of these four inquiries *vis-a-vis* one another. *Harrington* and *Tax Analysts and Advocates v. Blumenthal,* 184 U.S.App.D.C. ——, 566 F.2d 130 (1977) together indicate that these four inquiries are separate and to be considered *seriatim.* 184 U.S.App.D.C. at —— ——, 566 F.2d at 137, 138; 180 U.S.App.D.C. at 60, 553 F.2d at 205 n.68. Another recent opinion, however, indicates that causation and redressability are not separate prudential limitations, but "identifiable aspects of the 'injury in fact' test which has long been recognized as

the primary standing criterion in the federal courts." *American Soc'y of Travel Agents, Inc. v. Blumenthal,* 184 U.S.App.D.C. —— at —— ——, 566 F.2d 145 at 149–150 (1977). Still another formulation defines causation in terms of redressability, treating both elements as distinct from "injury in fact." *Animal Welfare Institute v. Kreps,* 183 U.S.App.D.C. 109 at 115, 561 F.2d 1002 (1977). Without pretending to resolve whether causation and redressability are of constitutional dimension, this discussion treats them as at least related to the threshold constitutional requirement of "injury in fact."

Moreover, even if the Chamber or its members were motivated in substantial part by economic self-interest, this would not necessarily preclude their asserting standing under NEPA. *National Helium Corp. v. Morton*, 455 F.2d 650, 655 (10th Cir. 1971).

■ That plaintiff's interests are cognizable generally under NEPA, however, does not compel the determination that it has sustained an injury in fact sufficient to maintain this action. Only if the Department's transmittal of the Andrus proposals to Congress has inflicted the requisite injury in fact may the plaintiff surmount this initial, constitutional hurdle in the way of its standing to sue. Thus, the issue at this point devolves on the nature of the injury in fact required under NEPA: May the injury derive solely from the submission of legislative proposals without an adequate EIS, and the concomitant denial of participation in the process of compiling an EIS, or must it comprise a more immediate, less speculative threat to the interests of the plaintiff? Plaintiff has urged the former construction, quoting the District of Columbia Circuit: "The harm against which NEPA's impact statement requirement was directed was not solely or even primarily adverse consequences to the environment; such consequences may ensue despite the fullest compliance. . . . Thus, the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates." *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 376, 499 F.2d 502, 512 (1974). The language quoted, however, bears not upon standing because it appears to have been conceded that residents of an area covered by a proposed urban renewal plan had standing to sue. Rather the case turns upon the propriety of injunctive relief against four neighborhood redevelopment programs which, though fully approved, had not actually been implemented when the District Court denied the injunctive relief on grounds of lack of imminence. *Id.*, 162 U.S.App.D.C. at 370–71, 499 F.2d at

506–07. The issue before the Court of Appeals was solely whether a project which had received all necessary legislative and administrative approval need be "imminent" in terms of physical implementation before preliminary injunctive relief was appropriate. *Id.*, 162 U.S.App.D.C. at 376, 499 F.2d at 512.

The facts underlying the present litigation make it clearly distinguishable. The injury in fact which plaintiff asserts, in the last analysis, is that its members would be adversely affected in their access to the forest, agricultural and mineral (including oil and gas) resources of Alaska if the Congress should enact the Andrus proposals into law. Assuming for the moment that Interior's failure to prepare an updated or supplemental EIS deprives interested parties of the opportunity to participate in the decision-making process and of a perspective on the factors which entered into the Secretary's decision, such deprivation by itself does not confer standing to sue on parties so deprived. This is because the Andrus proposals are in the lap of Congress. Their effect on the contents of any subsequent legislation and the date of the ultimate enactment of such legislation are speculative to say the least. In such a context, plaintiff has failed to allege specific injury in fact which in the words of the Supreme Court in *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) manifest "such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues."

The decision most clearly analogous to the matter at hand is *Wingfield v. OMB*, in which Judge Gesell recently held that section 102(2)(C) of NEPA "was not intended to create a right of action in a private party to claim injury in some fashion from the ongoing legislative process." No. 77–489, 9 ERC 1961, 1962 (D.D.C. Apr. 4, 1977). The plaintiff, owner of property on which surface and underground mining operations were in progress, sought to enjoin Executive agencies from transmitting to Congress reports and recommendations on pending

federal mining legislation. *Id.* Plaintiff distinguishes *Wingfield* on the ground that the departmental proposals in that action were far less sweeping, and worked much less radical a transformation of the pending bills than the Andrus proposals are alleged to do. Even if the difference between the two sets of proposals were as great as plaintiff claims, the determinative principles of *Wingfield* remain fully applicable:

"Plaintiff's economic interest in these legislative developments is highly speculative inasmuch as the legislation is still in the formative stage; and there is no indication of what the effect, if any, will be upon his affairs in the event some legislation of some kind is enacted.

. . . . .

"The injury here would occur only if the House accepts CEQ's recommendations, the Senate accepts them as well and . . . the legislative package as finally passed by both Houses is signed into law by the President."
9 ERC 1962–63.

The speculative and conjectural foundation for plaintiff's allegation of injury, together with the fact that the alleged injury will occur, if at all, in the future, undermine the "concreteness of the controversy" and severely militate against a finding of injury in fact for purposes of standing to sue. *Harrington v. Bush,* 553 F.2d 190, 209 (D.C. Cir. 1977).

2 & 3. *"Zone of Interests" and "Causation."* The second and third standing factors merit little discussion here. As noted above, plaintiff's interests, economically rooted though they may be, still fall within the zone of interests encompassed by NEPA. The causation factor, however, weighs against the plaintiff, principally because this discussion earlier rejected the argument that the Department's transmittal of the Andrus proposals to Congress inflicted any "injury in fact" on the plaintiff. The plaintiff has been caused no injury in fact by reason of the actions of the Secretary.

4. *"Redressability."* The determination that plaintiff has sustained no "injury in

fact" sufficient to confer standing to sue obviates consideration of remaining factors bearing on standing. However, the close conceptual relationship between "injury in fact" and "redressability" justifies more than cursory analysis of the likelihood that judicial relief could or would avert or alleviate the injury alleged. The plaintiff has sought a declaration that the transmittal of the Andrus proposals to Congress, unaccompanied by an adequate EIS, violates NEPA, and injunctive relief against such transmission. Finally, plaintiff requests the Court to order compliance with NEPA.

It is plaintiff's request for injunctive relief which brings the political questions implicated in this action to the forefront. Precisely when the inchoate political question here coalesced need not be decided; it suffices to note that no injunction would have issued after August 2, 1977, when the House Committee on Interior and Insular Affairs requested the Department's views and Secretary Andrus' testimony on the Alaska proposals. At that point, if not before, the political dialogue between the legislative and executive branches formally commenced, and any judicial intrusion thereafter risked breaching the separation of powers doctrine, and potentially infringing upon the President's constitutional power to present recommendations for legislation to the Congress. *U.S.Const.,* art. II, sec. 3; *see Wingfield v. OMB, supra* at 1963. Though directed on its face against transmittal of the proposals, an injunction would in effect restrain Congress from considering them, and in that respect, would be "wholly out of the question." W. Rodgers, *Environmental Law* § 7.2(d), at 714 (1977). *See also Atchison, Topeka & Santa Fe Railway Co. v. Callaway, supra* at 727 n.5.

Although the declaratory relief sought by plaintiff, if granted, would disrupt the legislative process less dramatically than injunctive relief, other considerations would militate against declaratory relief even if the plaintiff could demonstrate "injury in fact." Admittedly, the Court in *Atchison, Topeka & Santa Fe Railway Co.* reached a contrary conclusion, indicating first, that

such relief was within its power to afford; second, that declaratory relief would redress the injury complained of, and third, that declaratory relief, if ultimately granted, would "aid the legislative process." 431 F.Supp. at 727 n.5, 730. Moreover, as the Court noted, the District of Columbia Circuit has indicated that declaratory relief, even when granted without injunctive relief also, in some instances suffices to rectify the NEPA violations asserted. *Id.* at 730; *see Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 398 n.1, 481 F.2d 1079, 1082 n.1 (1973); *Jones v. District of Columbia Redevelopment Land Agency, supra*, 162 U.S.App. D.C. at 376, 499 F.2d at 512. None of these three decisions, however, controls under the circumstances of this action.

The factors weighing against declaratory relief here are manifold. One practical consideration stems from the probability, conceded by both parties, that preparation of a formal EIS on the Andrus proposals, assuming one to be required, would consume much time and prodigious effort; the question becomes whether Congress must defer its consideration of the Andrus proposals until the EIS was completed. If so, the award of declaratory relief would impede legislative deliberation as effectively as an injunction; if Congress decided to exercise its legislative powers, despite a declaratory judgment, the Court's grant of declaratory relief would be a gratuitous gesture, and the EIS itself a wasted effort, particularly in light of the possibility that the Andrus proposals might die in Congress. Another point against declaratory relief here is that Congress itself, the author of NEPA, is free to direct the Department to correct any NEPA violation on pain of refusing to consider the Andrus proposals until NEPA's requirements are met. *See* F. Anderson, *NEPA In the Courts: A Legal Analysis of the National Environmental Policy Act* 130–31 (1973). Yet another consideration bearing on the availability of declaratory relief is the possibility that plaintiff could seek a remedy in court after Congress enacts the Andrus proposals, if it does so. The *Scientists' Institute* decision does in-

deed indicate that the fact that a program may be underway does not preclude a judicial declaration of the necessity of an EIS. 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973). Any prediction that such relief would be available to plaintiff after Congress acts upon the Alaska lands would, of course, be conjectural. What is evident, however, is that redress of plaintiff's grievance must await definitive Congressional action. The considerations impelling that conclusion are similar to those which led the First Circuit in *Ogunquit Village Corp. v. Davis* to decline "[to] requir[e] to be done now what should have been done earlier" on a project physically completed before the action was filed. 553 F.2d 243, 245 (1st Cir. 1977). Although the Andrus proposals are far from actual implementation, the executive decision-making process took place, and its results had been requested by Congress, well before this action was filed. As in *Ogunquit Village*, whatever remedy there may be for plaintiff's grievance must, at least until Congress concludes its deliberations on the Andrus proposals, come from Congress itself.

To conclude, the problems of separation of powers implicit in this action limit the avenues of redress available to the plaintiff, and thus "point to the need for a *very clear* showing of concrete, personal injury in this type of case so that federal courts will not be thrust into the role of 'continuing monitors of the wisdom and soundness of Executive action. . . .'" *Harrington v. Bush, supra* at 215 (emphasis in original), *quoting Laird v. Tatum*, 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Plaintiff has not demonstrated that it has sustained such an injury. Accordingly, its motion for relief must be denied in full.

An Order consistent with the foregoing has been entered this day.