ANIMAL LEGAL DEFENSE
FUND, INC., et al.

v.

Mike ESPY, in his Official Capacity as Secretary, United States Department of Agriculture, et al., Appellants.

No. 92–5105.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 8, 1993.

Decided May 20, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Aug. 10, 1994.

Raymond W. Fullerton, Asst. Gen. Counsel, U.S. Dept. of Agriculture, argued the cause, for appellants. With him on the briefs was James Michael Kelly, Associate Gen. Counsel, U.S. Dept. of Agriculture.

Valerie J. Stanley, argued the cause and filed the brief for appellees. Kathleen V. Yurchak; entered an appearance, for amicus curiae Institute for Animal Rights Law, International Soc. for Animal Rights and Citizens for Animals.

Before WILLIAMS, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for Court filed by Circuit Judge SENTELLE.

Opinion concurring in part and dissenting in part filed by Circuit Judge STEPHEN F. WILLIAMS.

SENTELLE, Circuit Judge:

Two individuals and two organizations jointly brought suit against the Secretary of Agriculture under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1988). The plaintiffs alleged that one of the Secretary's regulations violates the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.* (1988), and that the Secretary's refusal to initiate a

rulemaking to correct the regulation was unlawful. On the Secretary's motion to dismiss, the court held that plaintiffs had standing to sue and that the regulation was reviewable under 5 U.S.C. § 706(2)(A). *See Animal Legal Defense Fund v. Yeutter*, 760 F.Supp. 923 (D.D.C.1991). The court later granted plaintiffs' motion for summary judgment on the merits. *See Animal Legal Defense Fund v. Madigan*, 781 F.Supp. 797 (D.D.C.1992). The Secretary now appeals.

After a thorough review of the record, it appears that none of the plaintiffs can demonstrate both constitutional standing to sue and a statutory right to judicial review under the APA. We therefore vacate the district court's judgment and remand the case with directions to dismiss.

## I.

In 1966 Congress enacted the Animal Welfare Act[1] to improve the treatment of certain animals. In its original form the Act protected "live dogs, cats, monkeys (nonhuman primate mammals), guinea pigs, hamsters, and rabbits." 7 U.S.C. § 2132(h) (Supp. II 1965–66). Four years later, Congress expanded the reach of the Act, adding dead animals and a catch-all phrase—the subject of dispute here. The controlling definition now reads:

> The term "animal" means any live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or *such other warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for research, testing, experimentation,* or exhibition purposes, or as a pet....

Pub.L. No. 91–579, § 3, 84 Stat. 1560, 1561 (1970) (emphasis added), codified at 7 U.S.C. § 2132(g). The new legislation qualified this expansion with various exclusions, *e.g.*, for horses not used for research, farm animals used for food, and livestock used to improve nutrition, breeding or production efficiency. *Id.*

After the 1970 amendments and an extensive rulemaking, the Department issued the regulation that is now contested. The Secretary defined "animal" essentially as it was defined in the statute except that the regulation expressly excluded "birds, aquatic animals, rats and mice." 36 Fed.Reg. 24,917, 24,919 (1971).[2] In the late 1980s the Secretary re-examined the regulatory definition but adhered to that exclusion. 54 Fed.Reg. 10,822, 10,823–24 (1989).

In 1989 two of the plaintiff-appellees, the Animal Legal Defense Fund and the Humane Society of the United States, requested that the Secretary again conduct a rulemaking to re-examine the exclusion. The Department refused, relying, it said, on the Act, its legislative history, and considerations of "the manpower, funds, and other resources available to administer effectively our animal welfare program." Letter from James W. Glosser (June 8, 1990), Joint Appendix ("J.A.") at 46. These associations, joined by two individual members, sued to enjoin the Secretary from excluding birds, mice and rats and to set aside the denial of their rulemaking petition.

## II.

To secure constitutional standing the plaintiffs must show injury in fact that is fairly traceable to the defendant's action and redressable by the relief requested. *See Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70

---

**1.** The Animal Welfare Act requires the licensing of dealers and exhibitors, 7 U.S.C. §§ 2133–2134, and instructs the Secretary to promulgate standards for humane care of animals and recordkeeping by dealers, exhibitors and research facilities, 7 U.S.C. §§ 2140, 2143. The statute further provides for inspections and investigations by the Secretary, 7 U.S.C. § 2146, penalties for violation of the statute or regulations, 7 U.S.C. § 2149, and an annual report to Congress summarizing reports from covered facilities. 7 U.S.C. § 2155.

**2.** The Department later removed aquatic animals from the exemption, 44 Fed.Reg. 36,868 (1979), and qualified the types of rats and mice exempted so that the regulation now excludes "[b]irds, rats of the genus *Rattus* and mice of the genus *Mus* bred for use in research." 9 C.F.R. § 1.1 (1993).

L.Ed.2d 700 (1982). To secure judicial review under the APA, they must show that the injuries they assert fall within the "zone of interests" of the relevant statute. *See Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).

■ On appeal, the Secretary has elected not to challenge the District Court's rulings on justiciability. *See* Appellant's Br. at 9 n. 5, n. 6. That waiver cannot satisfy the constitutional standing requirements, for Article III limits federal jurisdiction and "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." *FW/PBS, Inc., v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (internal quotations and citations omitted).

■ Nor does the Secretary's choice foreclose application of the "zone of interests" test. That judicially crafted doctrine serves the institutional obligations of the federal courts, rather than being a privilege of the parties that they may conclusively waive. The doctrine also embodies the prudential concern that federal courts should not adjudicate generalized grievances. *See, e.g., National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1047 (D.C.Cir.1989), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990); *Hazardous Waste Treatment Council v. EPA ("HWTC II"),* 861 F.2d 277, 287 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989); *Haitian Refugee Center v. Gracey,* 809 F.2d 794, 812–13 (D.C.Cir.1987). Thus we have examined legislative materials bearing on the zone of interests test even though the parties and the court below assumed the test was satisfied, *see Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), and have found it dispositive in a case where the parties had not briefed standing until we requested them to do so. *See HWTC II,* 861 F.2d at 280.

The appellees contend that *Air Courier Conference v. American Postal Workers' Union,* 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991), makes the waiver conclusive. In that case the Postal Service argued in the Supreme Court that the statute that formed the basis of the complaint in fact precluded judicial review of the Service's actions. The argument had neither been raised in the lower courts nor included in the questions on which certiorari was granted. The Court declined to decide the issue, observing that "[t]he judicial review provisions of the APA are not jurisdictional, so a defense based on exemption from the APA can be waived by the Government." 498 U.S. at 523 n. 3, 111 S.Ct. at 917 n. 3 (citation omitted).

That statement refers to waiver in the routine sense that, save for "jurisdictional" questions, an appellate court may decline to consider a claim neither pressed nor passed upon below. *See, e.g., Tennessee v. Dunlap,* 426 U.S. 312, 316 n. 3, 96 S.Ct. 2099, 2101 n. 3, 48 L.Ed.2d 660 (1976). It does not establish that such claims may *not* be considered. *See United States Nat. Bank of Or. v. Independent Ins. Agents of America,* —— U.S. ——, ——, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) ("a court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief"). In the present case, moreover, the constitutional and prudential requirements of standing were in fact litigated in the district court, a decision was given, and the judgment was appealed; nothing prevents this Court from reviewing the district court's authority to pass judgment in the first instance.

Appellees comprise two individual plaintiffs and two organizations. The individuals are Dr. Patricia Knowles and William Strauss; the organizations are the Animal Legal Defense Fund ("the Fund") and the Humane Society of the United States ("the Society"). We will consider their claims of standing *seriatim.*

**A.**

■ Knowles is a psychobiologist who worked from 1972 to 1988 in laboratories covered by the Animal Welfare Act but is not

presently so employed.[3] *See* Knowles Affidavit, J.A. at 91–95. Knowles has used rats and mice as a researcher at various institutions registered under the Act. She alleges that the agency's failure to define rats and mice as animals rendered her "unable to effectively control the care and treatment these institutions afforded the rats and mice she used"; that "the inhumane treatment of these animals will directly impair her ability to perform her professional duties as a psychobiologist"; and that "she will be required to spend time and effort in an attempt to convince the facility of the need for humane treatment." Plaintiff's Amended Complaint ("Complaint"), J.A. at 189–91.

We need not decide whether such aesthetic and professional injuries are sufficiently concrete to create a justiciable claim, for Knowles has failed to demonstrate an additional element of constitutional standing: the requirement that the plaintiff's injury be presently suffered or imminently threatened. *See, e.g., Lujan v. Defenders of Wildlife,* — U.S. —, — – — & n. 2, 112 S.Ct. 2130, 2136–38 & n. 2, 119 L.Ed.2d 351 (1992); *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990); *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

In *Lujan* the Court described the imminence requirement in these terms:

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *"certainly* impending" [quoting *Whitmore v. Arkansas,* 495 U.S. at 158, 110 S.Ct. at 1724–25 (emphasis added in *Lujan* )]. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control.

*Lujan,* — U.S. at — n. 2, 112 S.Ct. at 2138 n. 2.

Knowles' allegations fail for just those reasons. Her claim of standing rests on the following assertion of future injury:

> In order to further my career and gain professional advancement, I will be required to engage in further research. That research will necessitate using rats and mice in some follow-up research to my doctoral dissertation and in other psychobiological research I have planned. Since I have seen abuses (intentional or not) throughout my education and career, I have every reason to expect and fear that similar abuses will happen again when I conduct research on rats and mice.

Knowles Affidavit, J.A. at 94 ¶ 7. Admittedly her claim is marginally more impressive than that advanced by the affiants in *Lujan;* not because Knowles' statement of intent to subject herself to the future harm is plausible in light of her profession (that was also true of the *Lujan* affiants, see — U.S. at —, 112 S.Ct. at 2153 (Blackmun, J., dissenting)), but because *Lujan* contrasts vague intentions with "[a] description of concrete plans." — U.S. at —, 112 S.Ct. at 2138. But the central question is the immediacy rather than the specificity of the plan, for the underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in "a case in which no injury would have occurred at all." — U.S. at — n. 2, 112 S.Ct. at 2139 n. 2. *See also Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (plaintiff must show that she "is immediately in danger of sustaining some direct injury.").

For all the record shows that is precisely what happened here. Knowles merely states that at some undefined future time she "will be required to engage in further research," and even that is in part not literally true. She will not be *required* to do so. Whether she will do so is wholly within her control. Six years ago Dr. Knowles decided that her energies could most profitably be spent on

---

3. It is unclear whether Knowles currently performs animal research at all. Even if she does, it must by her own account be at an institution outside the coverage of the statute, and whatever professional or aesthetic injury she presently suffers is not fairly traceable to the Secretary's illegal failure to regulate.

activities other than research. That choice has determined the present state of affairs, in which she suffers no injury and will not do so unless she makes a further choice to subject herself to it. We cannot say that the injury she seeks to litigate is "certainly impending." *Whitmore,* 495 U.S. at 158, 110 S.Ct. at 1725. Knowles has failed to carry her burden to demonstrate constitutional standing, *see FW/PBS,* 493 U.S. at 231, 110 S.Ct. at 607–08, and we lack power to consider her claim.

### B.

 Plaintiff Strauss is an attorney and a member of one of the oversight committees that registered facilities are required to establish under the Act. *See* 7 U.S.C. § 2143(b) (1988). Strauss alleges that he was chosen as the member intended to "provide representation for general community interests in the proper care and treatment of animals." § 2143(b)(1)(B)(iii). As a committee member he is charged with various duties: inspecting his facility to ensure compliance with the Act, reporting on violations of standards promulgated by the Secretary, and ensuring that the animals' living conditions will be appropriate for their species in accordance with the Secretary's regulations.

Strauss alleges that the agency's failure to promulgate standards governing the humane treatment of birds, rats and mice has left him "without relevant guidance" in evaluating the treatment and conditions of those animals and in providing representation for general community interests in animal care. *See* Complaint, Supp. to J.A. at 192. He cannot adequately perform his statutory duties as a member of the committee because he is "without guidance in the form of specific, detailed regulations that instruct him how to ensure that ... the institution he serves will comply with the Act to minimize pain and distress to the animals it uses." *Id.* at 193. Finally, the lack of regulations for birds, rats and mice hampers his ability to ensure that those animals' living conditions are appropriate for their species, as the Act allegedly requires. *Id.* at 193–94.

Strauss has failed to present a cognizable claim of injury in fact. He has not even alleged any extra-legal aesthetic or personal injury of the sort that underlies Knowles' claim. He simply maintains that the Secretary has impeded his attempts to enforce the provisions of the statute, in his role as representative of "general community interests." His suit amounts to nothing more than an attempt to compel executive enforcement of the law, detached from any factual claim of injury. That type of suit has no place in the federal courts, for "[v]indicating the public interest (including the public interest in government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan,* —— U.S. at ——, 112 S.Ct. at 2145 (emphasis omitted).

### C.

 The Fund and the Society complain that the exclusion of birds, rats and mice from the definition of "animal" hampers their attempts to gather and disseminate information on laboratory conditions for those animals. If the definition were broadened, regulated laboratories would be legally obliged to provide information about their treatment of the animals to the Secretary, who in turn would include it in his annual report to Congress; the organizations could in turn acquire it and use it in public education and rulemaking proceedings. *See* Complaint, Supp. to J.A. at 179, 186–87. Similarly, the constricted definition of "animal" makes it difficult for the organizations to "work with" the laboratories and to educate them about the humane treatment of birds, rats and mice, for there is no legal requirement that the laboratories consider the welfare of those animals. *Id.* at 178, 184–85.

The district court held that these allegations conferred "informational standing" on the organizations. *See Animal Legal Defense Fund v. Yeutter,* 760 F.Supp. 923, 926–27 (D.D.C.1991). Although informational injury satisfies the minimum requirements of Article III standing, *see Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 936–39 (D.C.Cir.1986), *vacated on other grounds,* 494 U.S. 1001, 110 S.Ct. 1329, 108 L.Ed.2d 469 (1990), it does not fall within the

"zone of interests" protected or regulated by the Animal Welfare Act.[4]

■ Zone of interests analysis represents a judicial gloss on § 10 of the APA, which provides standing to a person "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1988). *See Clarke,* 479 U.S. at 400 n. 16, 107 S.Ct. at 757 n. 16 (1987). The test precludes review of administrative action if the particular interest asserted is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399, 107 S.Ct. at 757. Put conversely, the prospective litigant must show either a congressional intent to protect or regulate the interest asserted, or some other indication that the litigant is a suitable party to pursue that interest in court. *See, e.g., First Nat. Bank & Trust Co. v. National Credit Union Admin.,* 988 F.2d 1272, 1275 (D.C.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993); *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 923–24 (D.C.Cir.1989) *("HWTC IV ").*

A continuous line of circuit precedent holds that claims of informational injury can surmount the zone of interests threshold only in very special statutory contexts. *Haitian Refugee Center* observed that

> [i]f any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute ... has an interest that falls within the zone protected or regulated by the statute ... then the zone-of-interest test is not a test because it excludes nothing.... [S]uch a reading ignores the Supreme Court's decisions that persons who have only a 'generalized grievance' about the way in which government operates do not have standing.

809 F.2d at 813 (citing cases).

*Haitian Refugee Center* was promptly reaffirmed in *HWTC II.* The Hazardous

Waste Treatment Council sought to sue in its own right on the strength of an allegation identical to that advanced here: illegal exemption of regulated third parties from statutory reporting requirements thwarted the Council's ability to advance its educational and promotional activities. The Court held that the Council, far from showing any particular link between the asserted injury and the statutory purposes, had only shown a "general coincidence of goals." *HWTC II,* 861 F.2d at 287. The zone of interests test, again applied with sensitivity to the prudential bar against assertion of generalized grievances, precluded the claim. *Id. Accord National Fed'n of Fed. Employees v. Cheney,* 883 F.2d at 1047; *Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 85 (D.C.Cir.1991) (dictum).

The authorities cited to buttress the organizations' claim show only that Congress may, by specific enactments, override the zone of interests test and related prudential standing principles. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120–21, 71 L.Ed.2d 214 (1982), found informational injury sufficient to confer standing under a statute that extended justiciability to the full extent of Article III, and explicitly created a right to information, *see id.* at 373, 102 S.Ct. at 1121 (offense of falsely "represent[ing]"). *See also Consumers Union of U.S., Inc. v. FTC,* 691 F.2d 575, 576 (D.C.Cir. 1982) (same), *aff'd mem. sub. nom. Process Gas Consumers Group v. Consumer Energy Council of America,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). The Animal Welfare Act has no such provision.

*Competitive Enterprise Institute v. NHTSA,* 901 F.2d 107, 122 (D.C.Cir.1990), announced that informational injury is justiciable where the information sought is "essential to the injured organization's activities ... [and] lack of the information will render those activities infeasible." That pronouncement, however, arose from a suit brought to compel preparation of an informational state-

---

4. The organizations sue both in their own right and on behalf of their members. Although the latter type of claim must satisfy additional requirements, *see Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct.

2434, 2441, 53 L.Ed.2d 383 (1977), our holding on the antecedent zone of interests question makes it unnecessary to sift the allegations into their separate categories.

ment under the National Environmental Policy Act; informational injury is necessarily within the zone of interests of that Act, which of its own force vests concerned organizations with a statutory right to information. *See Sierra Club v. Andrus,* 581 F.2d 895, 900 n. 16 (D.C.Cir.1978), *rev'd on other grounds,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979). The broad statement in *Competitive Enterprise Institute* should thus not be extended beyond the legal setting that produced it, particularly when to do so would create conflict with a line of precedent more closely analogous to the present case.

Finally, the organizations rely heavily on *Action Alliance.* That case allowed a senior citizens' group to challenge agency regulations that restricted the flow of reports from third parties about compliance with the Age Discrimination Act. The essence of the complaint was that the regulations made it "more difficult for the organizations to assist elderly persons to know, enjoy, and protect their rights under the ADA." *Action Alliance,* 789 F.2d at 939. The Court held that "[s]uch interests as promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the 'zone of interests' protected by that statute." *Id.* (citing *Animal Welfare Institute,* 561 F.2d at 1010).

*Action Alliance* is consistent with the principle that informational injury, without more, does not fall within the zone of interests of the statute under which suit is brought. There the organizations' purpose was to advise their members of *the members' own rights* under the statute, rather than simply to educate all those who desire to promote the statute's substantive purposes. The Court subsequently noted just this feature of *Action Alliance* to harmonize it with the surrounding zone of interest precedents. *See Haitian Refugee Ctr.,* 809 F.2d at 813. And *Animal Welfare Institute,* cited in *Action Alliance* to support its broad version of zone of interests analysis, involved a claim of standing predicated on aesthetic rather than informational injuries and was thus inapposite. *See* 561 F.2d at 1007. The Court has made it clear that zone of interests analysis must be conducted with reference to the *particular* interest alleged. *See National Fed'n of Fed. Employees,* 883 F.2d at 1047.

■ The principle established by our decisions, then, is that to come within the zone of interests of the statute under which suit is brought, an organization must show more than a general corporate purpose to promote the interests to which the statute is addressed. Rather it must show a congressional intent to benefit the organization or some indication that the organization is "a peculiarly suitable challenger of administrative neglect." *HWTC II,* 861 F.2d at 283.

The Animal Welfare Act precludes any such showing, for the general informational and educative interests in animal welfare upon which the organizations base their suit are, by the terms of the Act, the province of a different institution altogether. The very section that orders the Secretary to promulgate standards for the humane treatment of animals, 7 U.S.C. § 2143, also establishes oversight committees of private citizens, whose members "represent society's concerns regarding the welfare of animal subjects used at such facility." § 2143(b)(1). The committees inspect their laboratories semiannually to "ensure compliance with the provisions of this chapter to minimize pain and distress to animals," § 2143(b)(3), and file a public report on the conditions and welfare of the animals, § 2143(b)(4)–(5). The evident congressional intent to entrust to the committees the functions of oversight and the dissemination of information precludes any inference that other private advocacy organizations are "peculiarly suitable challenger[s] of administrative neglect." *HWTC II,* 861 F.2d at 283.

It is simply not enough that the organizations exist to promote interests congruent with the humanitarian purposes of the statute, broadly conceived. We owe fidelity as well to the means by which the statute pursues its purposes, and on the face of the Act the organizations are not the intended representatives of the public interest in animal welfare. *See International Primate Protection League v. Institute for Behavioral Research,* 799 F.2d 934, 939 & n. 4 (4th Cir. 1986) (noting evidence of congressional intent to commit the Act to administrative enforce-

ment). The organizations have not asserted any claim within the zone of interests protected by the Act, and their suit may not be heard.

### III.

As the record discloses no claim of justiciability that survives application of the constitutional and statutory restrictions on our power to hear the case, the decision of the district court is vacated and the case remanded with directions to dismiss.

*It is so ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusion that the plaintiffs other than Dr. Patricia Knowles lack standing, and concur (with qualifications noted below) in those portions of the opinion reaching that result. Unlike the majority, however, I find Dr. Knowles's allegations and uncontradicted affidavits adequate to satisfy both the constitutional and prudential requirements of standing. See *Valley Forge College v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

Dr. Knowles is a psychobiologist and member of the Humane Society who worked in laboratories covered by the Animal Welfare Act from 1972–1988. As a researcher who has used birds, mice and rats in the past and whose continuing research necessitates their use in the future, she explains that the exclusion of such animals from the Department's protective regulations has adversely affected both her professional research and her sensibilities. First, she explains, the exemption "impair[s] her ability to perform professional duties," because the ill treatment of experimental animals in the institutions where she has worked has caused the loss of "hundreds of data points" when her animal subjects were deprived of food, water, a clean cage or a temperate environment. Second, the mistreatment has caused her "personal distress" at "witnessing the plight of [the mistreated] animals". Her affidavit includes graphic depictions of the spectacle of pigeons injured or killed in the process of being weighed in cans too small for their bodies.

The majority does not pass on whether Dr. Knowles's injuries amount to "injury in fact", and, as there may be doubt, I should explain why I believe they do. They are, as required by *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), "distinct and palpable and not abstract or conjectural or hypothetical". *Id.* at 751, 104 S.Ct. at 3324 (internal quotation marks and citations omitted). The delay and possible frustration of professional research experiments—like having experimental test tubes knocked over—seems about as concrete an injury as one can imagine. Dr. Knowles's interest in not seeing animals mistreated before her very eyes is also enough. Decisions of the Supreme Court make clear that the satisfactions of watching animals in their natural habitat are concrete enough for Article III purposes. In *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), for example, the Court found that animal protection groups, which sought to require the Secretary of Commerce to certify Japan's refusal to abide by whaling quotas, had alleged "a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting". *Id.* at 231 n. 4, 106 S.Ct. at 2867 n. 4, citing *Sierra Club v. Morton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), and *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). More recently, in *Lujan v. Defenders of Wildlife*, —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court said that "the desire to use or observe an animal species, *even for purely aesthetic purposes*, is undeniably a cognizable interest for purpose of standing", *id.* —— U.S. at ——, 112 S.Ct. at 2137 (emphasis added); it denied standing only because of the improbability that members of the plaintiff organization would ever be in a position to suffer the deprivation. See also *Animal Welfare Institute v. Kreps*, 561 F.2d 1002, 1007 (D.C.Cir.1977) (finding injury in impairment of plaintiffs' aesthetic interest in studying Cape fur seals in their natural habitat).

Neither our cases nor those of the Supreme Court deal precisely with the injury to a plaintiff's sensibilities from seeing the suffering of animals that are within the plaintiff's view simply because of her work, but their principles seem to embrace that injury. *Japan Whaling Association* and *Defenders of Wildlife* clearly recognize people's affirmative aesthetic interest in viewing animals enjoying their natural habitat. The gulf between seeing experimental animals decently treated and seeing them cruelly treated seems every bit as great as that between seeing animals savoring their natural habitat and not seeing them at all; if there is any difference between the two types of loss, the former would seem more acute. Our own cases have indicated a recognition of people's interest in seeing animals free from inhumane treatment. In *Animal Welfare Institute* we expressly noted the plaintiff organizations' allegation that their members asserted an interest in seeing the seals "alive in their natural habitat under conditions in which the animals are not subject to ... inhumane treatment", 561 F.2d at 1007, and then identified their aesthetic interests as among those protected, *id.,* presumably thereby embracing the interest in seeing animals free from inhumane treatment. See also *Humane Society of the United States v. Hodel,* 840 F.2d 45, 52 (D.C.Cir.1988) (recognizing interest in avoiding exposure to animals killed by hunters). Although in both those cases it appears that the individuals were drawn to the sites by an affirmative interest in wildlife, I can see no reason why the viewer's purpose in being near the animals should make a difference (at least so long as the injury is not a self-inflicted wound, endured for the purpose of generating standing).

Here the majority does not find Dr. Knowles's injury "actual or imminent", as required by cases demanding a conflict that is real and immediate, or "certainly impending". *Defenders of Wildlife,* —— U.S. at ————— n. 2, 112 S.Ct. at 2138–39 n. 2 (1992); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 1724–25, 109 L.Ed.2d 135 (1990); *Redden v. ICC,* 956 F.2d 302, 306–07 (D.C.Cir.1992). Although the case is close, I think the future injury adequately assured. It is true that "past exposure to illegal conduct does not *in itself* show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present, adverse effects", although "[p]ast wrongs" are *"evidence* bearing on whether there is a real and immediate threat of repeated injury." *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (emphasis added, quotation marks and citations omitted); see also *Halkin v. Helms,* 690 F.2d 977, 1005 (D.C.Cir.1982) (dismissing claim for injunctive relief against CIA for past unconstitutional surveillance where government had ceased the operation).[1] Thus, while Dr. Knowles's animal research from 1972 to 1988 is probative of whether her future injury is imminent, it does not "in itself" establish the requisite imminence. More is necessary.

And there is more. Dr. Knowles unequivocally asserts that she "will be *required* to engage in further research", and that the research "will necessitate using rats and mice in some follow-up research to my doctoral dissertation and in other psychobiological research I have *planned."* [2] The reality of this

---

[1] This inquiry resembles a mootness analysis, where courts must ascertain whether past injury is "capable of repetition". See, e.g., *Christian Knights of the KKK v. District of Columbia,* 972 F.2d 365 (D.C.Cir.1992) (finding injury capable of repetition where KKK only alleged a future intention to again march in Washington, D.C. with no concrete plans to do so in the near future). The "capable of repetition" doctrine does not apply in this case, however, because Dr. Knowles separated from the covered labs before the suit was filed; if her prior injury became moot before she sued, likelihood of repetition would not save it. *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991) (mootness exception for disputes capable of repetition "will not revive a dispute which became moot before the action commenced").

[2] Note that it is not necessary for Dr. Knowles to accept employment with a covered laboratory, contrary to the majority's concern, Maj.Op. at 500 n. 3, in order to subject herself to the injury to her professional research. Because all distributors of laboratory animals (excepting retail pet stores) are covered by the Act, 7 U.S.C. § 2132(f), inhumane treatment of any animals she would purchase for any research she might conduct privately would establish a sufficient in-

requirement and planning is backed by Dr. Knowles's personal history—the years she has devoted to securing her doctorate and the 16 years spent in research in laboratories covered by the Animal Welfare Act. The "requirement" is, to be sure, contingent—on her choosing *not* to abandon the human capital accumulated in securing her doctorate and in her further pursuit of psychobiological research. Although she interrupted her research in 1988 for undisclosed reasons,[3] the record gives no basis for believing that she intends any such abandonment.

Her future injury is thus far more assured than that of the plaintiffs in *Defenders of Wildlife*. They expressed only a nebulous future intent to return to the foreign habitats of the endangered species, with no idea of when or how this trip might occur; upon being questioned about a possible trip to Sri Lanka, one affiant admitted "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Defenders of Wildlife*, — U.S. at —, 112 S.Ct. at 2138. Both named plaintiffs in *Defenders of Wildlife* had only spotty records of foreign travel to support the inference they would return, and neither had actually witnessed the endangered animals on the excursions they had made before the challenged FWA regulation took effect. — U.S. at —, 112 S.Ct. at 2138. Dr. Knowles, on the other hand, states that she "will be required" to engage in future research that she has already planned; as failure to do so would require her to forego virtually all future return on her sizable investment in psychobiological research, I see no reason to doubt her claim.

For these reasons, I believe Dr. Knowles's stated injuries adequate to permit review of the Department's decisions and dissent from so much of the court's opinion as finds them inadequate.

\* \* \*

As to the standing of other plaintiffs, a couple of caveats to the majority opinion: First, I see no need to rely upon *United States Nat. Bank of Or. v. Independent Ins. Agents of America*, — U.S. —, —, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993), to reject the possibility that the government waived its challenge to standing based on the plaintiffs' failure to fall within the "zone of interests". The zone of interests test is jurisdictional, so that it is our duty to consider the issue regardless of the defendants' failure to raise the issue in this court (as in this case) or in the trial court. See, e.g., *National Wildlife Federation v. United States*, 626 F.2d 917, 924 n. 13 (D.C.Cir.1980) ("Because standing implicates our jurisdiction under Article III, and also is pertinent to self-imposed prudential limitations on our jurisdiction, [ ] 'waiver' is necessarily ineffective"); see also *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1366 (D.C.Cir.1990) (investigating zone of interests challenge "[f]or the first time on appeal"). *Air Courier Conference v. American Postal Workers Union*, 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991), is not to the contrary. There the Court found waiver of a claim that a specific statute exempted the Post Office from the APA (and thus from its judicial review provisions), saying that "[w]hether a cause of action exists [the exemption issue] is not a question of jurisdiction". *Id.* at 523 n. 3, 111 S.Ct. at 917 n. 3. It did not suggest that any standing questions were not jurisdictional.

Second, I do not understand the majority opinion to conclude that the oversight committees established by the Animal Welfare Act necessarily would have standing were they to allege an informational injury be-

---

jury. Cf. *Hazardous Waste Treatment Council v. U.S.E.P.A.*, 861 F.2d 277, 282 (D.C.Cir.1988) (standing based on costs imposed on purchaser of wastes because lax regulation increased likelihood of contamination of wastes purchased).

**3.** It may well be that Dr. Knowles left the laboratory environment to avoid exposure to the suffering of animals, in which case the Department's

rule is inflicting a current injury, forcing her to choose between a sacrifice of career goals and continued exposure to inhumane treatment. However, because the party invoking jurisdiction must allege and support each element of standing, *Defenders of Wildlife*, — U.S. at — – —, 112 S.Ct. at 2136–37, we cannot rely on this possibility.

cause of "evident congressional intent to entrust to the committees the functions of oversight and the dissemination of information", Maj.Op. at 503. The observation of *International Primate Protection League v. Institute for Behavioral Research,* 799 F.2d 934, 940 (4th Cir.1986), that the statutory "goals were not to be realized through a succession of private lawsuits", if correct, suggests quite a different view. The question is best left for another day.