A. T. CROSS COMPANY, Plaintiff,

v.

SUNIL TRADING CORPORATION and Narsing N. Narson, Defendants.

No. 79 Civ. 680 (KTD).

United States District Court,
S. D. New York.

Feb. 28, 1979.

48

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; Leslie D. Taggart, Frank J. Colucci, Howard B. Barnaby, Jr., New York City, of counsel.

Bell, Wolkowitz, Kalnick, Klee, Green & Beckman, New York City, for defendants; Allen Green, Barry H. Wolkowitz, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

The plaintiff, A. T. Cross Co. [hereinafter referred to as "ATC"], brings this action against defendants, the Sunil Trading Corporation [hereinafter referred to as "Sunil"], and Narsing N. Narson [hereinafter referred to as "Narson"], alleging trademark infringement, unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

The plaintiff, ATC, is a Rhode Island corporation who has for over one hundred years manufactured Cross writing instruments. Defendant Sunil is a New York corporation in the business of exporting "general merchandise." The individual defendant, Narson, is an officer and moving force behind the Sunil Corporation. Although not a United States citizen, Narson has resided in the United States for the past six years.

This case involves a highly sophisticated scheme in which bogus Cross pens, manufactured in a foreign country, were being passed through the United States by use of New York's foreign trade zone for shipment to still another foreign country for ultimate sale as genuine Cross pens "made in the U.S.A."

The scheme had its impetus in Taiwan at the Wang Pao Long Manufacturing Company [hereinafter referred to as "Wang Pao"] where ball point pens which purported to be genuine Cross pens were being manufactured.[1] Indeed, upon visual examination it is virtually impossible to distinguish a genuine Cross from the counterfeit. Each and every detail of the Cross pen—from the distinctive "Cross" mark and configuration to the inscriptions "made in U.S.A." and "A. T. Cross, Lincoln, R.I."—has been duplicated.

While on a business trip in Taiwan, the defendant, Narson, went to the Wang Pao plant and placed an order for 3,500 dozen of the bogus pens for shipment to his New York corporation, Sunil. The pens were subsequently shipped to Sunil but were received by Sunil in New York purportedly for the sole purpose of exportation and sale to Sunil's agent, Metro International Agencies, [hereinafter referred to as "Metro"], in the Canary Islands. Since none of the pens were to be distributed within the United States, they remained in what Congress has designated New York's foreign trade zone. 19 U.S.C. §§ 81a *et seq.*[2] The zone is simply a bonded warehouse where foreign goods

---

1. Apparently as a result of plaintiff's efforts in Taiwan, the principals connected with the Wang Pao operation have all been arrested and their machinery seized with whatever stock of counterfeit Cross pens were on hand. Indeed, it was through ATC's efforts in Taiwan that it was able to ascertain Wang Pao's customers, which included Sunil, and begin tracking down the counterfeit pens before their goodwill was irreversibly damaged.

2. Title 19 provides, in pertinent part, that each port of entry in the United States shall be entitled to at least one foreign trade zone wherein foreign goods may be stored, sold, exhibited, broken up, repacked, assembled, dis-

tributed, sorted and even mixed with foreign or domestic merchandise without being subject to the customs laws of the United States.

The practical effect of foreign goods entering the foreign trade zone is that although physically imported into the United States, while they remain in the foreign trade zone and provided they are finally exported to a foreign port without distribution within the United States, they are not subject to import duties. The more subtle, and for purposes of the instant action the most important effect of using the New York Foreign Trade Zone in transporting these pens was to aid and abet defendants in their fraudulent scheme to pass the counterfeit Cross pens off as genuine Cross pens—manu-

destined exclusively for foreign ports are stored and are not deemed to be "imports" for purposes of the United States Customs Tariff Laws.[3]

While in the foreign trade zone, Narson would inspect the counterfeit pens which were then broken down into smaller units, repacked, relabeled and shipped to Metro in the Canary Islands. Apparently, Sunil's sale to Metro was effected by the use of letters of credit. Issuance of the letters, however, was conditioned upon Sunil's providing to Metro certain certificates calculated to represent that the counterfeit pens were actually products of the United States. See Plaintiff's Appendix at B. Certificates were obtained by Sunil, through the connivance of Narson, for at least five of the shipments to Metro. See Plaintiff's Appendix at F. Presumably these pens were subsequently sold by Metro as genuine Cross pens.

Sunil's use of the New York foreign trade zone served two very important functions. First, it enabled Sunil to obtain the counterfeit pens from Taiwan without having to pay any import duties thereon. More importantly, however, it enabled Sunil to disguise the true origin of the pens which, in turn, aided it in passing off the bogus Cross pens as having truly been manufactured in the United States.[4]

Upon discovery of defendants' scheme, plaintiff filed the instant suit and immediately sought, and was granted, an order temporarily restraining defendants from continued trade in the counterfeit pens. Thereafter, defendants agreed to the issuance of a preliminary injunction covering the marketing of the bogus pens during the pendency of this suit. The agreement,

however, provided that defendants were not admitting liability for the alleged infringement and expressly reserved the right to contest the jurisdiction of this Court over the instant dispute.

A hearing was held on February 21, 1979 to determine the question of jurisdiction. Based upon that hearing, together with a review of the applicable law, I must conclude that this Court does have jurisdiction over the subject matter of this dispute and the preliminary injunction was properly issued.

Defendants argue that since the goods in issue remained exclusively in the foreign trade zone and were never introduced into the United States, they are not goods "in commerce" for purposes of the Lanham Act. Defendants, thus, conclude that Congress, in establishing the foreign trade zone, intended to carve out an area within the borders of the United States in which the Federal Courts could not assert jurisdiction.

In making this argument defendants ignore that inherent in national sovereignty "is the power to impose, even upon foreigners owing no allegiance [to the United States], liability for acts done abroad which proximately cause damage within the territorial limits of the sovereign." *United States v. Sisal Sales Corp.*, 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042; *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945); *Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F.Supp. 594, 600 (S.D.Cal.1956), *aff'd* 245 F.2d 874 (9th Cir. 1957), *cert. denied*, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958). Consequently, resolution of the jurisdictional issue before me depends not upon the existence of Congressional power to confer

---

factured in the United States and exported from New York, New York.

**3.** There is some dispute as to whether all the counterfeit Cross pens received by Sunil were in fact held within the Foreign Trade Zone exclusively for transmission to the Canary Islands. Indeed, plaintiff submitted a receipt issued by United States Customs indicating that six cartons of pens were taken out of the zone and the appropriate import duties paid. See Plaintiff's Appendix at C. Unfortunately, it is unclear whether these six cartons contained

the counterfeit Cross pens in issue. In light of my decision on the jurisdictional implications of the federal trademark laws and the Foreign Trade Zone, I need not decide this factual issue.

**4.** In addition, by holding the pens in the Foreign Trade Zone defendants were able to stall the goods before shipment to Metro long enough to obtain the false certificates which evidenced that the pens were in fact manufactured in the United States of America.

jurisdiction upon this Court, but rather upon the legislative intent expressed in exercising its power. *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282–83, 73 S.Ct. 252, 97 L.Ed. 252 (1952).

▮ The Lanham Act, 15 U.S.C. § 1051 *et seq.*, upon which ATC grounds its claim, "confers broad jurisdictional powers upon the courts of the United States." *Steele, supra*, 344 U.S. at 283, 73 S.Ct. at 254. Indeed, the Act itself provides that:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; . . . to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.

It would appear that the only reasonable interpretation of the legislative intent underlying the Lanham Act was to render its jurisdictional predicates coextensive with those of the commerce clause. Under such an interpretation, the Lanham Act would clearly extend to the goods in issue.

▮ In *Steele v. Bulova, supra*, the Supreme Court noted that even where unfair trade practices were committed in foreign countries and the sole conduct complained of within the United States was otherwise lawful, jurisdiction under the Lanham Act would nevertheless attach where the lawful conduct within this country was an essential part of the unlawful scheme. *Steele, supra*, 344 U.S. at 287, 73 S.Ct. 252. *See*

*also Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F.Supp. 594 (S.D.Cal. 1956), *aff'd* 245 F.2d 874 (9th Cir. 1957), *cert. denied*, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958).[5] This is precisely what the defendants did in the instant case. Moreover, as the evidence indicates, not only did the defendants maliciously purchase the counterfeit pens in Taiwan but obtained certificates of United States origin which became part of the goods as sold to Metro. Consequently, they themselves misrepresented the origin of the goods in violation of the Lanham Act and said acts of misrepresentation took place in the United States. *See Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633 (2d Cir. 1956). Thus, the case at bar presents a jurisdictional base under the Lanham Act in excess of the one expressly approved by the Supreme Court in *Steele*.

This, however, does not end our inquiry. It must also be determined whether in creating the foreign trade zone, it was intended to exclude the jurisdictional reach of the Lanham Act from the zone.

▮▮ The legislative intent behind the Foreign Trade Zone Act of 1934 was twofold. First, the intent was to facilitate exports from the United States of goods originating in foreign ports by not treating them as imports subject to United States taxes on import. In addition, it was intended to admit foreign goods into the United States so that United States citizens could be involved and, consequently, financially profit from the breaking down, repacking and relabeling of the goods as well as their combination with American goods. It is also important to note that the foreign trade zone was created pursuant to the exclusive and plenary power of Congress under the Commerce Clause to regulate

---

**5.** Although defendants' attempt to distinguish these cases in that their holdings are expressly limited to the infringing acts of an American citizen abroad, their efforts are to no avail. Despite the fact that Narson is not a United States citizen, he was in all respects acting in his capacity as an officer of a New York corporation when engaged in the purchase and sale of the counterfeit pens. Consequently, he and Sunil stand in the same position as the American citizens in *Steele* and *Ramirez*.

It should also be noted that plaintiff's Complaint may also be read to include a state claim for unfair competition. As such, there would appear to be diversity jurisdiction. In light of my holding, however, I need not rely upon this jurisdictional base.

commerce with foreign nations. *During v. Valente*, 267 App.Div. 383, 46 N.Y.S.2d 385 (1st Dep't 1944).

The entire operation of the foreign trade zone is under the close supervision of the United States Customs officials. To this end, custom officials alone control access to the goods once they are within the zone and supervise all repacking, relabeling and combinations which take place in the zone. More importantly, however, the customs' officers have the power, albeit rarely exercised, to inspect the goods as they enter the foreign trade zone. 19 U.S.C. § 81(c).

There is absolutely no indication in the Foreign Trade Zone Act that Congress ever intended to exclude goods therein from regulation under United States laws by the Federal Courts. Indeed, the totality of evidence indicates the contrary. The Customs officials are given a substantial amount of authority not only in admitting and exporting goods from the zone, but also in dealing with the goods while therein.

Consequently, since the Commerce Clause extends into the foreign trade zone, and the jurisdictional reach of the Lanham Act is coextensive therewith, the only possible conclusion is that absent an express repudiation of federal jurisdiction (which is not contained in the Foreign Trade Zone Act), the jurisdictional parameters of the Lanham Act reach within the foreign trade zone.

Accordingly, defendants' motion to dissolve the preliminary injunction together with a dismissal of the entire action for want of subject matter jurisdiction is denied. The injunction will stand pending the ultimate determination of the instant suit.

SO ORDERED.