**PHIBRO ENERGY, INC.,**
**et al., Plaintiffs,**

v.

**Ronald H. BROWN, et al., Defendants.**

**Slip Op. No. 95–86.**
**No. 92–06–00394.**

United States Court of
International Trade.

May 9, 1995.

Williams & Connolly, Washington, DC (John G. Kester and David D. Aufhauser), for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen. of the U.S.; Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Mark S. Sochaczewsky and Carla Garcia Benitez); Robert J. Heilferty, Atty.–Advisor, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendants.

Bracewell & Patterson, Washington, DC (Scott H. Segal and Gene E. Godley) and S. Lee Wingate, Texas City, TX (Counsel to the City of Texas City), of Counsel, for amici curiae the City of Texas City, the Texas City Independent School Dist., the County of Galveston, and College of the Mainland.

## OPINION

CARMAN, Judge:

Plaintiffs Phibro Energy USA, Inc. and Phibro Energy, Inc. (collectively "plaintiffs")[1] move for judgment on the agency record pursuant to U.S. CIT R. 56.1. In their motion plaintiffs seek judicial review of an order of the United States Foreign–Trade Zones Board (Board) denying as not in the public interest an application filed by the Port of Houston Authority for special-purpose subzone status for plaintiffs' petroleum refinery in Texas City, Texas. *Application of the Port of Houston Authority,* 56 Fed. Reg. 67,058 (U.S. Foreign–Trade Zones Bd.1991) (resolution and order). Defendants oppose the motion. Amici curiae the City of Texas City, the County of Galveston, the Texas Independent School District, and College of the Mainland (collectively "amici"), support the Board's decision and contend plaintiffs are not real parties in interest. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(i)(1), (4) (1988).

## BACKGROUND

### A. *Procedural History*

Plaintiffs commenced this action and moved for judgment upon the agency record in the United States Court of International Trade (CIT) in 1992. Defendants opposed plaintiffs' motion and argued the Foreign–Trade Zones Act (FTZA) did not provide for judicial review of a denial of a subzone application. *See Phibro Energy, Inc. v. Franklin,* 17 CIT ——, ——, 822 F.Supp. 759, 761 (1993) (*Phibro I*). The CIT denied plaintiffs'

---

1. Plaintiffs inform this Court that plaintiff Phibro Energy USA, Inc. is a wholly-owned subsidiary of plaintiff Phibro Energy, Inc.

motion and dismissed the action for lack of subject matter jurisdiction. *See id.* at ——, 822 F.Supp. at 766.[2] The United States Court of Appeals for the Federal Circuit (CAFC) subsequently granted plaintiffs' unopposed motion for summary reversal in view of the CAFC's decision in *Conoco, Inc. v. United States Foreign–Trade Zones Board,* 12 Fed.Cir. (T) ——, 18 F.3d 1581 (1994) (*Conoco II*),[3] and remanded to the CIT for adjudication on the merits. *See Phibro Energy, Inc. v. Brown,* No. 93–1389, slip op. at 1, 1994 WL 371892 (Fed.Cir.1994). The present opinion rules on the merits of this action.

### B.  *Facts*

The Port of Houston Authority submitted to the Board an application on behalf of plaintiffs to establish two special-purpose foreign-trade subzones for refinery sites in Houston and Texas City, Texas.  (R. 1.)[4] The application stated foreign-trade subzone status would benefit greatly the communities of Houston and Texas City, and the State of Texas through the following: (1) the expansion of an existing $30 million annual payroll in Houston and Texas City; (2) the expansion of an economic impact of over $2 billion per year in Texas; (3) the increase of exports consisting of 6.3 million barrels of petroleum to over 12 million barrels, valued at $440 million per year; (4) the reduction of the United States' balance of trade through increased exports; (5) preservation of two United States refining operations, thereby preventing losses resulting from a shutdown, including the loss of over 4,488 direct and indirect jobs; and (6) stimulation of growth in the United States refining industry with approximately $36 million in capital improvements at the two refineries.  (R. 1 at 2–3.)

Initially, the application generated favorable public comment from a number of organizations, companies, and government officials.  (*See* R. 3–5, 7–9, 11–12.)  In early 1991, however, officials from three local taxing authorities—Texas City, Galveston County, and the Texas City Independent School District—contacted the Board to register concern regarding the Texas City site because of the potential loss of *ad valorem* tax revenue.  (*See* R. 21–24.)  The local governmental entities further stated they had not been notified that an application was in process.  (*See* R. 21, 23, 24.)  All three entities requested an opportunity to be heard in opposition to plaintiffs' application.  (*See* R. 21–24.)

Due to the lack of local input, the Board considered, and included in the administrative record, submissions by local authorities in opposition to a subzone grant covering the Texas City site.  (*See* R. 66; R. 110 at 4–5.)  These objections were based on the harmful consequences resulting from the projected loss of *ad valorem* tax revenues and "the precedent it would set within the County for other such proposals."  (R. 110 at 8;  *see* R. 83.)  In 1989, the Texas City refinery paid over $600,000 in *ad valorem* taxes.  (R. 110 at 4.)  According to the Chief Appraiser for Galveston County, estimates indicated creation of a Texas City subzone would result in a tax exemption of up to $60 million in appraised value, causing "a loss in revenue on the order of $1,000,000 to the entities involved.  The school district alone could lose over $500,000."  (R. 83 at 1.)  Furthermore, the appraiser estimated, "[i]f Foreign Trade Zone status is conferred on other potential applicants, as much as $400,000,000 of the local tax base could be exposed to total exemption."  (*Id.*)

2.  In *Phibro I,* this Court held, in part, that "[b]ecause Congress has authorized [foreign-trade zones] for the express purpose of encouraging exports, the Court concludes that its residual jurisdiction over import-related matters under [28 U.S.C.] § 1581(i) does not apply to decisions by the [Board] denying a subzone application." *Phibro I,* 17 CIT at ——, 822 F.Supp. at 764.

3.  In *Conoco II,* the CAFC "concluded that, as applied to [*Conoco*], the FTZA is a statute 'providing for revenue from imports.'  Thus, we re-

ject the conclusion of the Court of International Trade in [*Phibro I*] that the FTZA *per se* governs export transactions only."  *Conoco II,* 12 Fed. Cir. (T) at ——, 18 F.3d at 1590 n. 24 (citing *Luggage and Leather Goods Mfrs. of Am. v. United States,* 7 CIT 258, 265, 588 F.Supp. 1413, 1419 (1984)).

4.  Plaintiff Phibro Energy USA, Inc. was known as Hill Petroleum Corporation at the time of the application.

The Board approved the application for plaintiffs' Houston refinery, but denied the application for plaintiffs' Texas City refinery. *Application of the Port of Houston Authority*, 56 Fed.Reg. 67,058 (U.S. Foreign–Trade Zones Bd.1991) (resolution and order). Plaintiffs then commenced this action.

## CONTENTIONS OF THE PARTIES

Plaintiffs submit two major contentions in opposition to the Board's decision. First, plaintiffs contend the Board acted arbitrarily, capriciously and abused its discretion when it ignored the applicable statutory criteria for granting or denying subzone status. According to plaintiffs, the FTZA does not empower the Board to use a public interest test in its determinations. Instead, plaintiffs argue, the plain language of 19 U.S.C. § 81g requires the Board to grant a subzone application meeting § 81g's criteria of suitable location and sufficient facilities.[5] Plaintiffs further argue the Board's consideration of the potential loss of *ad valorem* tax revenue as a basis for denying plaintiffs' application was contrary to the statute because Congress actually disapproved such a basis when it amended the FTZA in 1984. In enacting 19 U.S.C. § 81o (e), plaintiffs argue, Congress sought to " 'eliminate such tax concerns from among the factors to be considered by potential FTZ operators or users.' " (Pls.' Br. in Supp. of Mot. for J. on Agency R. at 14–15 (quoting H.R.Rep. No. 267, 98th Cong., 1st Sess. 35 (1983)) (plaintiffs' emphasis deleted).)[6] As additional support for plaintiffs'

contention the Board acted arbitrarily, capriciously, and abused its discretion, plaintiffs cite to Article I, Sections 8 and 10 of the United States Constitution to argue the Board's basis for denying the subzone application was contrary to constitutional policy.[7]

Plaintiffs second major contention is that the Board's action had no rational basis in fact. Plaintiffs claim even if the Board could properly disapprove a subzone application to promote state *ad valorem* taxation, no evidence here demonstrated a subzone grant would substantially impact the complaining localities' *ad valorem* tax revenues. In 1989, plaintiffs maintain, the total tax revenues from *ad valorem* taxation at the Texas City refinery amounted to $686,709, or only 0.73% of the tax revenues of the three objecting entities. Furthermore, plaintiffs argue, the speculation concerning future "unidentified hypothetical applicants" was just that—mere speculation, which can neither substitute for facts in agency adjudication nor satisfy the rationality requirement for administrative decision making. (*Id.* at 19.)

Defendants contend the Board's denial of the application as not in the public interest was consistent with the FTZA and was not arbitrary, capricious, or an abuse of discretion. In so doing, defendants advance two major arguments. First, defendants argue the Board's public interest test was derived from and is consistent with the FTZA. Defendants claim 19 U.S.C. § 81o (c) gives the Board explicit authority to restrict or condi-

---

**5.** 19 U.S.C. § 81g reads in its entirety as follows:

 If the Board finds that the proposed plans and location are suitable for the accomplishment of the purpose of a foreign trade zone under this chapter, and that the facilities and appurtenances which it is proposed to provide are sufficient it shall make the grant.
 19 U.S.C. § 81g (1988).

**6.** 19 U.S.C. § 81o (e) provides:

 **(e) Exemption from State and local ad valorem taxation of tangible personal property**
 Tangible personal property imported from outside the United States and held in a zone for the purpose of storage, sale, exhibition, repackaging, assembly, distribution, sorting, grading, cleaning, mixing, display, manufacturing, or processing, and tangible personal property produced in the United States and

held in a zone for exportation, either in its original form or as altered by any of the above processes, shall be exempt from State and local ad valorem taxation.
 19 U.S.C. § 81o (e) (1988).

**7.** Article 1, Section 8 of the Constitution provides in part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States...." U.S. Const. art. I, § 8. Article 1, Section 10 of the Constitution states the following in relevant part: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws...." U.S. Const. art. I, § 10.

tion activities to protect the public interest.[8] Although the Act does not define "public interest," defendants assert "the phrase is plainly broad enough to encompass the concerns of local elected officials with respect to the projected economic impact of a proposed subzone." (Defs.' Opp'n to Pls.' M. at 17.) Furthermore, defendants maintain, the Board's interpretation of the public interest test in this case does not contradict the 1984 amendments to the FTZA, but rather is consistent with congressional intent that *established* foreign-trade zones be exempt from *ad valorem* taxation. Moreover, defendants assert, the Board has applied the public interest test consistently in previous cases and Congress has been aware of that consistent application.

Defendants' second major argument is that the administrative record supports the Board's determination. Defendants maintain the Board performed a detailed analysis of the evidence presented by all parties prior to rendering a decision. After considering all of the evidence of record, defendants claim, the Board properly concluded plaintiffs had failed to meet the burden "of showing that the proposal would result in a significant public benefit and was in the public interest." (*Id.* at 24.)

Amici contend the Board's decision was not arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. In so doing, amici argue the Board appropriately considered lost tax revenue in its deliberation. The deliberation the Board undertakes, amici argue, "is a balance of equities in which a judgment as to *net economic effect* must be reached." (Amicus Curiae Br. in Opp'n to M. for J. on Agency R. at 2.) Amici contend that here, however, plaintiffs "fall short of the net assessment required for demonstration of public interest." (*Id.*) Additionally, amici argue plaintiffs failed to consult adequately local authorities prior to the submission of plaintiffs' application to the Board. Amici maintain, furthermore, that loss of local tax reve-

nue occasioned by a grant of subzone status would indeed be substantial.

Amici also contend plaintiffs are not real parties in interest. Amici argue that under the FTZA plaintiffs have no legal rights against the government and, in fact, would not have acquired legal rights even if the subzone application had been granted. While amici admit plaintiffs maintain a direct financial interest in both denial of the subzone application and the outcome of this action, amici claim plaintiffs' financial interest is insufficient to confer the necessary legal rights. This shortcoming, amici contend, is fatal to plaintiffs' ability to maintain this suit because "[t]here must be some legal right to be enforced in order to be the real party in interest." (Am. Amicus Curiae Br. at 3.) Amici argue the true party in interest in this proceeding is the Port of Houston Authority as the applicant for the subzone and the party who would be charged with maintenance and administration of the subzone had the Board granted the Port of Houston Authority's application. Accordingly, amici ask this Court to dismiss this action pursuant to U.S. CIT R. 17(a) if, after a reasonable time under the circumstances, the Port of Houston Authority does not join this action.

Plaintiffs respond to amici's procedural argument by claiming that plaintiffs are persons "'adversely affected or aggrieved by agency action'" under the Administrative Procedure Act (APA). (Pls.' Resp. to Am.Amicus Br. at 2 (quoting 5 U.S.C. § 702).) Because a person qualifies as a real party in interest when a statute gives that person the right to bring suit, plaintiffs contend, plaintiffs "*are* the real parties in interest." (*Id.* (citing 6A Charles A. Wright *et. al., Federal Practice and Procedure* § 1550 at 384 (1990) (Wright & Miller)).) In fact, plaintiffs assert, the right of "aggrieved" persons who were not parties to an application to challenge Board orders on applications for subzones is a long-recognized right.

---

8. 19 U.S.C. § 81*o* (c) reads in its entirety as follows:

**(c) Exclusion from zone of goods or process of treatment**

The Board may at any time order the exclusion from the zone of any goods or process of treatment that in its judgment is detrimental to the public interest, health, or safety.
19 U.S.C. § 81*o* (c) (1988).

Plaintiffs further respond to amici's procedural arguments by drawing comparisons to Fed.R.Civ.P. 17. A particular goal of Fed. R.Civ.P. 17, plaintiffs argue, is to assure nominal parties are not used to manipulate citizenship in order to create or avoid federal jurisdiction, a situation not at issue here. Furthermore, plaintiffs contend, Fed. R.Civ.P. 17 motions rest largely in judicial discretion and should be brought with reasonable promptness.

## STANDARD OF REVIEW

In *Conoco, Inc. v. United States Foreign–Trade Zones Board,* 18 CIT ——, 855 F.Supp. 1306 (1994) (*Conoco III* ), this Court set forth the standard of review applicable to decisions of the Board. *See also Conoco, Inc. v. United States,* 19 CIT ——, 885 F.Supp. 257 (1995) (*Conoco IV* ) (reiterating the standard of review set forth in *Conoco III* ). Based on the standards prescribed by section 706 of the APA, this Court must first determine " 'whether the [Board] acted within the scope of [its] authority' in order to determine whether the Board's action violated § 706(2)(C)." *Conoco III,* 18 CIT at ——, 855 F.Supp. at 1311 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (further citation omitted)). If this Court determines the Board did act within the scope of its authority, "the Court may then consider whether the Board's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' in violation of § 706(2)(A)." *Id.* at ——, 855 F.Supp. at 1311 (quoting 5 U.S.C. § 706(2)(A) (1988) and citing *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24).

## DISCUSSION

### A. *Plaintiffs' Eligibility to Sue*

Amici contend plaintiffs are not the real parties in interest. The crux of amici's argument is that, in order to be a real party in interest, one must possess some enforce-

able legal right. Because plaintiffs have no legal right directly against the federal government, amici argue, plaintiffs are not the real parties in interest.

Under section 702 of the APA, a "[p]erson suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1988). Plaintiffs contend they qualify as "adversely affected or aggrieved by agency action." The statutory provisions of the FTZA do not speak to challenges to Board disapprovals of subzone applications. This silence, however, is not fatal to plaintiffs' ability to bring this action. Even though the FTZA is statutorily silent on challenges to Board disapprovals of subzone applications, the Court finds that once the application requesting subzone status for plaintiffs' refinery was submitted on plaintiffs' behalf,[9] plaintiffs became eligible under section 702 to seek judicial review of whether the Board's determination was made in a manner consistent with the Board's authority under the FTZA and not arbitrarily or capriciously.

In this analysis, the Court notes that

[i]n the realm of public law, when governmental action is attacked on the ground that it violates private rights ... the question whether the challenger is a proper party plaintiff to assert the claim rarely is analyzed in terms of real party in interest.... Instead, the courts have tended to rely on the judgemade doctrine of standing to sue. To the extent that standing in this context is understood to mean that the litigant actually must be injured by the governmental action that he is assailing, then it closely resembles the notion of real party in interest under Rule 17(a), inasmuch as both terms are used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits.

6A Wright & Miller, § 1542 at 329–30 (footnotes omitted); *see New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d

---

9. The Court does not address the question, not at issue here, whether plaintiffs could seek judicial review if the Port of Houston Authority had refused to submit the application.

452, 465, *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984).[10] Furthermore, section 702, if applicable, is a statute interpreted as giving standing to challenge agency action. *See, e.g., Animal Legal Defense Fund v. Quigg,* 932 F.2d 920, 937 (Fed. Cir.1991) ("Appellants invoke section 702 of the APA which gives standing to any person 'adversely affected or aggrieved by an agency action within the meaning of a relevant statute.' ") (quoting section 702 of the APA and citing *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 757 n. 16, 93 L.Ed.2d 757 (1987)); *Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 502 (D.C.Cir.1994) (explaining section 702 "provides standing to a person 'adversely affected or aggrieved by agency action within the meaning of a relevant statute' "). Accordingly, this Court will analyze it as such.[11]

**10.** In *New Orleans Public Service, Inc.,* the court observed as follows:

As a recognized text has observed, [the] zone of interest standing test in public law cases "is somewhat analogous to the Rule 17(a) standard that the party possess a substantive right under the applicable law...." In a sense, a party within the zone of interests protected by a statute may possess a type of substantive right not to have the statute violated.

*New Orleans Pub. Serv., Inc.,* 732 F.2d at 465 (quoting Wright & Miller). For a discussion of the "zone of interests" test in standing doctrine, see *infra* pp. 869–871.

**11.** The Court recognizes that although the principles of real party in interest and standing bear resemblance, "several ... elements of the standing doctrine are clearly unrelated to the rather simple proposition set out in Rule 17(a)." 6A Wright & Miller, § 1542 at 330 (footnote omitted). However, even if the Court forces the issue of plaintiffs' eligibility to challenge this agency action into a strict real party in interest analysis, the Court *still* finds plaintiffs *eligible to* bring suit.

The Court's rules provide in relevant part:

Every action shall be prosecuted in the name of the real party in interest.... No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

U.S.CIT R. 17(a) (1988). To determine whether a plaintiff is a real party in interest, the Court must determine whether the plaintiff "is the enti-

In *Armco Steel Corp. v. Stans,* 431 F.2d 779 (2nd Cir.1970), the Second Circuit reviewed a *domestic steel producer's* appeal challenging the legality of action taken by the Board in granting authorization to establish a foreign-trade subzone. As a preliminary issue, the court addressed the question of whether the domestic steel producer had standing to sue. *Armco,* 431 F.2d at 784. Noting the United States Supreme Court's decision in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the court found the domestic producer had standing. The court explained the domestic producer was

not only complaining of economic injury to itself from unlawful competition, but [was] invoking for itself a "statutory aid to

ty which under substantive law has the right sought to be enforced." *South African Marine Corp., Ltd. v. United States,* 10 CIT 415, 419, 640 F.Supp. 247, 251 (1986) (citing 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 17.07 at 17–65 (2nd ed. 1985)); *see id.* at 422, 640 F.Supp. at 254 (" 'The meaning and object of the real party in interest principle embodied in Rule 17 is that the action must be brought by a person who possesses the right to enforce the claim and who has a significant interest in the litigation.' ") (quoting *Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.,* 485 F.2d 78, 83 (4th Cir.1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1450, 39 L.Ed.2d 493 (1974)). Here, plaintiffs seek judicial review of the Board's disapproval of the subzone application made on plaintiffs' behalf. Specifically, plaintiffs seek to enforce the right to have a submitted subzone application reviewed in manner consistent with the Board's authority under the statute, and not in a manner that is "arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law.*" 5 U.S.C. § 706(2)(C), (A).

Although the FTZA's statutory provisions are silent *as to who may challenge a Board disapproval of a subzone application, the FTZA as a whole, the purpose and scheme of the FTZA, indicates plaintiffs qualify as real parties in interest.* As the Court discusses *infra,* it appears a major purpose of the FTZA is to strengthen the foreign trade of the United States *and to benefit domestic business in the process.* Furthermore, the Court sees nothing in the FTZA indicating congressional intent to prohibit parties such as plaintiffs here from seeking to enforce the right to have an application that was submitted on their behalf reviewed in accordance with the FTZA.

standing" because the tariff laws are demonstrably intended to protect the competitive interest of the entire class of domestic steel producers, a class of which it is a member.

*Id.*

■ Here, as in *Armco*, plaintiffs are proper parties to maintain this action. Under current standing doctrine, "[f]irst, the plaintiff must have suffered 'an injury in fact'. . . . Second, there must be a causal connection between the injury and the conduct complained of. . . . Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). The Court has no difficulty in determining plaintiffs satisfy the requirements of personal injury, causation, and effective relief. In addition to these standing requirements, however, prudential considerations require plaintiffs be "within the 'zone of interests' a particular statute addresses." *Quigg,* 932 F.2d at 925 (quoting *Air Courier Conference of Am. v. Am. Postal Workers Union,* 498 U.S. 517, 521–23, 111 S.Ct. 913, 917, 112 L.Ed.2d 1125 (1991) and cases cited therein, including *Ass'n of Data Processing Serv. Orgs.,* 397 U.S. at 153, 90 S.Ct. at 829–30). "The 'zone of interest' test is a guide to determine whether a particular plaintiff may bring an action pursuant to the [APA, 5 U.S.C. § 702], to complain of a particular agency action." *Schering Corp. v. FDA,* 51 F.3d 390, 395–96 (3rd Cir.1995) (citing *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987)) (footnote omitted). Thus, plaintiffs must fall within the "zone of interests" the FTZA addresses to have standing. *See Quigg,* 932 F.2d at 937 (explaining that the statute whose violation forms the basis of the complaint is the relevant statute for the "zone of interests" inquiry because "to fall within the 'zone of interests' protected by section 702, it is necessary to be within the 'zone of interests' addressed by a 'relevant statute' ").

According to the 1934 House Report, the FTZA was enacted to "encourage and revive the foreign trade of the United States by permitting the establishment in the United States of foreign-trade zones." H.R.Rep. No. 1521, 78th Cong., 2d Sess. 1 (1934). The House Report also quotes a letter from the President of the Chamber of Commerce of the United States to the Chairman of the Subcommittee on Foreign Trade Zones that states in part, "It is believed that a free zone is a part of the equipment of a country for doing a diversified international trading business which American business men ought to have made available to them." *Id.* at 2. Similarly, the Senate Report discussing the 1950 amendment to the FTZA, which eliminated provisions excluding manufacturing and exhibiting in zones, contains an excerpt from a letter from the Secretary of Commerce to the Committee on Ways and Means that states in part, "The existence of the present trade zones has done much to stimulate American commerce both import and export. *The proposed permission of manufacturing in the zones is expected further to assist American business* by enabling it to manufacture certain types of products for export under minimum cost conditions." S.Rep. No. 1107, 81st Cong., 1st Sess. (1949), *reprinted in* 1950 U.S.Code Cong.Serv. 2533, 2534 (emphasis added).

This Court finds the concern of Congress to aid domestic business through zone grants in the process of strengthening United States' foreign trade is evident. *Cf. Chrysler Motors Corp. v. United States,* 14 CIT 807, 814, 755 F.Supp. 388, 394 (1990) ("When Congress first made provision for foreign-trade zones, it was perceived that these zones would relieve businesses from the burden of paying duties on imported merchandise and then having to seek drawback upon exportation, or employing bonds or bonded warehouses for export duties.") (citing H.R.Rep. No. 1521 at 2–3), *aff'd,* 10 Fed. Cir. (T) ——, 945 F.2d 1187 (Fed.Cir.1991); *see also A.T. Cross Co. v. Sunil Trading Corp.,* 467 F.Supp. 47 (S.D.N.Y.1979).[12] Furthermore,

---

**12.** In *A.T. Cross Co.,* the court explained that [t]he legislative intent behind the [FTZA] was two-fold. First, the intent was to facilitate

exports from the United States of goods originating in foreign ports by not treating them as imports subject to United States taxes on im-

no direction from Congress exists indicating an authority that physically submits a subzone application on behalf of another must be the party to bring an action challenging disapproval. Accordingly, this Court finds plaintiffs' interests fall within the "zone of interests" sought to be protected by the FTZA. Therefore, this Court finds plaintiffs have standing to bring this action.

■ The Court notes, furthermore, that based on *Conoco II,* this Court is not dissuaded from its decision simply because 19 U.S.C. § 81r(c) provides an explicit provision under which zone grantees may appeal zone revocations. *See* 19 U.S.C. § 81r(c) (1988) (providing that a Board order revoking a previously granted zone is final, "unless within ninety days after its service the grantee appeals to the court of appeals for the circuit in which the zone is located"). In *Conoco II,* the CAFC addressed the government's argument, raised below, that because the FTZA specifically provides for appeals from zone revocations but does not provide for judicial review of other Board actions, no judicial review was available for other Board actions. *Conoco II,* 12 Fed.Cir. (T) at ——, 18 F.3d at 1584–85. Despite the presence of § 81r(c), however, the CAFC had "no difficulty in holding that the orders of the [Board], absent a clear and unequivocal expression of Congressional intent to the contrary, are generally subject to judicial review in accordance with established principles of law." *Id.* at ——, 18 F.3d at 1585 (footnote omitted). The CAFC explained that 19 U.S.C. § 81r

> is the only statement in the statute of Congressional intent regarding judicial review of Board orders. The statute leaves unsaid what is to be done with orders of the Board other than orders of revocation.

The most that can be said for the statute is that, if these other orders are judicially reviewable, jurisdiction-granting authority must be located in other legislation. The least that can be said for the statute is that it falls far short of a clear declaration of Congressional intent regarding reviewability of these other orders.

*Id.* at ——, 18 F.3d at 1585. Simply because Congress specified a particular type of review for revocations was not inconsistent with this conclusion. "Congress may well have simply intended that revocation orders, because of their impact on already established rights of the parties, be reviewed by direct appeal to the appropriate courts of appeal." *Id.* at ——, 18 F.3d at 1585.

**B.** *The Foreign–Trade Zones Board's Decision*

■ In *Conoco III,* this Court held it could not review a Board decision when the Board's order did "not contain an understandable basis that would permit the Court to determine whether the Board acted within the scope of its authority." *Conoco III,* 18 CIT at ——, 855 F.Supp. at 1311.[13] In the present case, as in *Conoco III,* the Board's notice announcing its decision to disapprove the Texas City subzone does not indicate on what basis the Board rendered its decision. *See Conoco III,* 18 CIT at ——, 855 F.Supp. at 1311–12. Although the notice indicates the Board determined a grant of subzone status for the Texas City site would not meet the FTZA's requirements "because approval of that part of the proposal would not be in the public interest,"[14] the notice does not explain in what manner approval of the Texas City subzone would not be in the public interest or the factors the Board considered in rendering that determination.

---

port. In addition, it was intended to admit foreign goods into the United States *so that United States citizens could be involved and, consequently, financially profit from* the breaking down, repacking and relabeling of the goods as well as their combination with American goods.
*A.T. Cross Co.,* 467 F.Supp. at 50.

13.     If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory

underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.
*SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947) (quoted in *Conoco III,* 18 CIT at ——, 855 F.Supp. at 1311).

14.     *Application of the Port of Houston Authority,* 56 Fed.Reg. 67,058 (U.S. Foreign–Trade Zones Bd. 1991) (resolution and order).

The administrative record helps the Court surmise the Board's bases for its determination. The Board's own decision to deny the Texas City subzone, however, provides no clarification. As this Court discussed in *Conoco III,* this type of

lack of clarity in the Board's decision[ ] prevents the Court from discerning the path the Board followed ... and improperly requires the Court to "supply a reasoned basis for the [Board's] action that the [Board] itself has not given...." [*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).] While the Court may surmise upon what grounds the Board decided to impose the conditions, the Board and not the Court bears the burden of "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." [*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (quotation and citation omitted).]

*Conoco III,* 18 CIT at ——, 855 F.Supp. at 1312. Because the Board has not set forth adequately the basis for disapproving the Texas City subzone, the Court finds it cannot ascertain whether the Board acted in conformity with its statutory authority pursuant to 5 U.S.C. § 706(2)(C), or whether the Board's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). *See Conoco III,* 18 CIT at ——, 855 F.Supp. at 1312. Accordingly, the Court remands this action to the Board so that it may fully explain the rationale underlying its decision to deny that portion of plaintiffs' application requesting subzone status for the Texas City site.

### CONCLUSION

The Court holds plaintiffs may properly bring this action. The Court further holds the Board failed to articulate the basis upon which it decided to deny that portion of plaintiffs' application requesting subzone status for the Texas City, Texas site. The Court remands this action to the Board so that it may fully explain the rationale under-

lying that disapproval. On remand, in addition to whatever matters the Board deems it appropriate to address, the Board shall explain whether and in what manner approval of plaintiffs' request for subzone status for the Texas City site would not serve the public interest. In so doing, the Board shall explain all factors considered in reaching its determination.

### *ORDER*

This case having been duly submitted for decision, and the Court after due deliberation, having rendered a decision herein; now, therefore, in conformity with said decision it is hereby

**ORDERED** that this action is remanded to the United States Foreign–Trade Zones Board; and it is further

**ORDERED** the Board shall fully articulate the rationale underlying its decision to deny the Texas City subzone grant, including whether and in what manner approval of that subzone would not be in the public interest; and it is further

**ORDERED** the Board shall file its Remand Results with this Court no later than June 8, 1995; and it is further

**ORDERED** plaintiffs, defendants, and amici curiae may each file a single response to the Board's Remand Results of no more than ten pages no later than June 22, 1995; and it is further

**ORDERED** plaintiffs may file a reply of no more than five pages no later than June 29, 1995; and it is further

**ORDERED** no extensions of time and no further briefing shall be allowed.